788 So.2d 458 (2001)
STATE of Louisiana
v.
Bartholomess ROBICHAUX.
No. 2000-KA-1234.
Court of Appeal of Louisiana, Fourth Circuit.
March 14, 2001.
*461 Harry F. Connick, District Attorney, Leslie P. Tullier, Assistant District Attorney, New Orleans, Counsel for Plaintiff/Appellee.
Pamela S. Moran, Louisiana Appellate Project, New Orleans, Counsel for Defendant/Appellant.
Court composed of Chief Judge WILLIAM H. BYRNES III, Judge MIRIAM G. WALTZER, Judge MICHAEL E. KIRBY.
KIRBY, Judge.

STATEMENT OF CASE
On May 27, 1999, Bartholomes Robichaux[1] was indicted for the aggravated rape and attempted second-degree murder of J. F.[2] He was arraigned and pled not guilty on June 1, 1999. On January 4, 2000 a twelve-member jury found him guilty of attempted second degree murder but acquitted him of the rape charge. The court sentenced him on January 14, 2000 to thirty-five years at hard labor.

STATEMENT OF FACT
Criminalist Joseph Tafaro testified by stipulation as an expert in the field of serology. Tafaro stated that hair, fiber and blood testing on the claw hammer found at the crime scene proved positive for the presence of human blood. He also said that he tested several articles of clothing and a pair of shoes taken from the defendant at the time of his arrest. The testing was positive for human blood on the left shoe. However, testing as to blood type on the shoe was inconclusive. The jacket, sweat pants and shorts taken from the defendant contained group "O" blood.
*462 Paramedic Jeff Jaycox testified that he and fellow paramedic, Randall Droady, responded to a police call for assistance on March 16, 1999. When he arrived at the scene the victim, J. F., was bleeding profusely from head injuries. Jaycox worked to stem the blood flow, and questioned the victim. She was confused, disoriented, and did not appear to understand his questions. Once the victim was stabilized, Jaycox and Droady transported her to Charity Hospital.
Nancy Kenny, NOPD operator, testified that she dispatched the police to N. Tonti Street at 4:03 p.m. on March 16, 1999 as a result of a 911 call for assistance.[3]
NOPD Officer Michael Agustus testified that on March 16, 1999, a juvenile alerted him and his partner, Larry Singleton, to trouble at the rear apartment at 1947 North Tonti Street. As Agustus approached the apartment, he noticed drops of blood on the ground and rear porch. The victim, partially clothed and bleeding profusely from head wounds, met him at the back door. He sat the victim down, and called EMS. The victim identified the defendant as her assailant, and said that the defendant tried to kill her by hitting her in the head with a hammer. Neighbors on the scene supplied the defendant's description, which Agustus radioed to other units in the area. About an hour later, Agustus and Singleton observed a subject fitting the description at the intersection of New Orleans and North Rocheblave Streets. The subject fled as the officers approached but was apprehended after a brief chase.
Officer Larry Singleton testified corroborating Officer Agustus' testimony. Singleton identified crime scene photographs, including pictures of a bloody mattress and pillow, a bloodied hole in the wall, blood on the walls and floors throughout the apartment as well as a bloody hammer in a bucket near the rear door of the apartment. Singleton stated that the victim identified the defendant as her assailant from a picture Singleton found in the apartment.
Detective Frank Polito testified that he responded to a call of attempted murder at 1947 North Tonti Street, rear apartment. When he arrived, EMS personnel were ministering to the victim, who was dazed and bleeding profusely. The victim identified Bartholomes Robichaux as her attacker. Polito interviewed the victim two weeks after the incident during which she related the specifics of her ordeal. Her speech was halting and slow but she told Polito that the defendant beat, raped and tortured her from approximately 9:00 a.m. until 4:30 p.m. the day of the incident.
Detective Brian Baudier of the Sex Crimes Unit testified that in the early morning hours of March 17, 1999, physicians at Charity Hospital notified the NOPD that they suspected the victim had been raped. Baudier went to Charity to investigate but was unable to interview the victim because she had just come out of surgery. While at the hospital, he collected a sexual assault exam kit, and requested that the NOPD crime lab examine the swabs and blood sample in the kit. He said that the kit did not contain a doctor's report and that the Crime Lab examination of contents noted the absence of seminal fluid and sperm but typed the blood sample as group "O". Baudier interviewed the victim approximately ten days after the assault. Although the victim understood *463 his questions, her responses were slow and labored.
D. F., the victim's mother, testified that her daughter suffered life-threatening injuries, underwent several hours of surgery and did not regain consciousness for three or four days following surgery. Ms. F. said that the first opportunity her daughter was able to speak, she said the defendant raped her three times. Her daughter's speech is bad but comprehendible. Ms. F. met the defendant during the summer of 1998, when he performed roof and fence repairs at her house. She denied that her daughter and the defendant ever dated. She further stated that at the time of the assault, the victim was engaged to someone else.
The victim testified that she met the defendant in February 1998. Several months later, she contacted him about doing some roofing work for her mother. The victim spoke to the defendant frequently during the six or seven-month period the defendant worked on her mother's house. The victim denied ever dating or becoming intimate with the defendant. She stated that when he completed the work in December or January, she told him he was no longer welcome to visit her because she was seeing someone. The victim related that on the morning of the attack, she stopped at a Broad Street grocery store after taking her children to school. As she entered her van to leave the store, she noticed the defendant in the passenger seat of a gold vehicle with another male she did not recognize. The defendant approached her vehicle, jumped in, and told her to drive to his house because he needed to talk to her. She was afraid of him, so she complied with his demand. When they arrived at the defendant's house, he forced her out of the van, held her arms behind her, and threatened to break her neck if she did not accompany him. Once inside the house, the defendant ordered her to remove her clothes. When she failed to do so, the defendant ripped her clothes off. During the course of the day, the defendant raped her three times, and beat her. They continued to fight throughout the day. At approximately 4:30 p.m., they heard police radios coming down the driveway, responding to a neighbor's complaint of loud noise. The defendant covered her mouth, and once again threatened to kill her if she made a sound. After the police left, she ran out the back door, but the defendant caught her by her hair, and dragged her back inside. He tried to break her neck. When he was unsuccessful, he began hitting her repeatedly in the head with the hammer. He continued hitting her body with the hammer, and crushed her right hand. The victim drifted in and out of consciousness as the defendant continued to kick, punch and torture her. At one point, the defendant sexually assaulted her with a metal clothes hanger. By the time the police returned, the defendant was gone. The victim told the police that the defendant tried to kill her. She answered some questions but was unable to tell the police all that happened to her. Following surgery she remained comatose for several days. The next thing she remembered was waking up in the hospital intensive care unit. She suffered several skull fractures, brain damage and perforations of her bladder and colon.
Dr. Renatta Osterdock, chief resident of neurosurgery at Charity Hospital, testified that she examined the victim upon arrival at the hospital. She noted multiple head lacerations and a depressed left temporal skull fracture, extruding brain matter. The fracture on the top of the victim's skull was life threatening. The left temporal skull fracture left the victim with aphasia, impaired speech and speech cognition, as well as some memory loss.
*464 The defendant testified that he has two prior convictionsone in 1978 for burglary and another in 1979 for armed robbery. He stated that he and the victim were friends and lovers. The pair met when he did some roofing work for the victim's mother. On the morning of March 16, 1998, the victim came to the defendant's apartment to smoke crack cocaine. A fight erupted when the victim refused to pick up her children from school and the defendant flushed her cocaine down the toilet. When the victim tried to stop him, she fell into a bucket of nails and cut her legs. She followed the defendant into the bathroom, hitting him. She then locked herself in the bathroom to smoke more cocaine. In the meantime, the police came knocking on the door. He was afraid the answer the door because the victim had drugs. When he told her the police had come and gone, she exited the bathroom, and grabbed him by the testicles. In his weakened state, she began to pummel him with her fists, retaliating for his destroying her cocaine. She became increasingly abusive and aggressive, to the point that he picked up the hammer to ward off her attack. The defendant said that the victim fabricated the entire story because she has much to hide from the child protection agency and the man to whom she is engaged. He explained that the victim bruised herself as he tried to free himself of her hold. When he noticed the victim's injuries, he went to call an ambulance. On the way back to his house, a neighbor told him the police were at his house, and talking about a homicide. He was frightened so he did not go home.

ERRORS PATENT
A review for errors patent on the face of the record reveals two sentencing errors. First, the sentence for attempted second degree murder pursuant to La. R.S. 14(27)30.1 is a term of imprisonment at hard labor without benefit of parole, probation or suspension of sentence. In this case, the judge sentenced the defendant to thirty-five years at hard labor but failed to restrict the sentence without benefits. Thus, the sentence is illegally lenient. However, because this is an error favorable to the defendant, and the State has not complained, the illegally lenient sentence cannot be corrected on appeal. State v. Fraser, 484 So.2d 122 (La. 1986).
Second, the trial court failed to observe the twenty-four hour delay required between denial of a defense motion for new trial and sentencing of the defendant. LSA-C.Cr.P. art. 873 provides:
Art. 873. Delay between conviction and sentence
If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.
Although the defendant does challenge his sentence on grounds of excessiveness, La.C.Cr.P. art. 852 provides that a motion for a new trial must be in writing. At the beginning of the sentencing hearing, defense counsel noted: "Judge, prior to the sentencing, I would like to put on the record an oral motion for a new trial..." There is nothing in the record to indicate that defense counsel supplemented his oral motion with a written motion. Moreover, this court has recognized that a defendant may implicitly waive the twenty-four hour waiting period for imposing sentence by announcing his readiness for the sentencing hearing. State v. Jefferson, 97-2949 (La.App. 4 Cir. 4/21/99); 735 So.2d *465 769, 772. In this case, by virtue of the defense counsel's statement, defendant announced his readiness for sentencing, which implicitly waived the waiting period.

COUNSEL ASSIGNMENT OF ERROR NUMBER 1
In this first assignment, defendant asserts that his thirty-five year sentence is unconstitutionally excessive.
The defendant did not make an oral objection to the sentence or file a written motion for reconsideration of the sentence as mandated by La.C.Cr.P. art. 881.1. This issue was not preserved for appellate review.

COUNSEL ASSIGNMENT OF ERROR NUMBER 2; PRO SE ASSIGNMENT OF ERROR NUMBER 6
In this assignment, appellate counsel contends that if the previous issue was not preserved for appellate review, then defendant's trial counsel was ineffective for failing to file a motion to reconsider sentence and/or orally object to the sentence imposed.
In a pro se assignment, the defendant argues trial counsel was ineffective because he failed to file pre-trial motions which would have excluded inadmissible evidence, and failed to subpoena witnesses on the defendant's behalf.
"As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted." State v. Howard, 98-0064, (La.4/23/99), 751 So.2d 783, cert. denied, Howard v. Louisiana, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999). However, where the record is sufficient, the claims may be addressed on appeal. State v. Wessinger, 98-1234, p. 43 (La.5/28/99), 736 So.2d 162, 195, cert. denied, Wessinger v. Louisiana, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999); State v. Bordes, 98-0086, (La.App. 4 Cir. 6/16/99), 738 So.2d 143, 147.
Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Brooks, 94-2438, (La.10/16/95), 661 So.2d 1333, 1337 (on rehearing); State v. Robinson, 98-1606, (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 126. In order to prevail, the defendant must show both that: (1) counsel's performance was deficient; and (2) he was prejudiced by the deficiency. Brooks, supra; State v. Jackson, 97-2220, (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. Counsel's performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, p. 9 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669, writ denied, 99-0721 (La.7/2/99), 747 So.2d 15. Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance the result of the proceeding would have been different; "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; State v. Guy, 97-1387, (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236, writ denied, 99-1982 (La.1/7/00), 752 So.2d 175.
La. Const. art. I, § 20 explicitly prohibits excessive sentences; State v. Baxley, 94-2982, (La.5/22/95), 656 So.2d 973, 977. Although a sentence is within *466 the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. State v. Brady, 97-1095, (La.App. 4 Cir. 2/3/99), 727 So.2d 1264, 1272, rehearing granted on other grounds, (La.App. 4 Cir. 3/16/99); State v. Francis, 96-2389, (La.App. 4 Cir. 4/15/98), 715 So.2d 457, 461, writ denied, 98-2360 (La.2/5/99), 737 So.2d 741. However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. Baxley, 94-2982 at p. 10, 656 So.2d at 979, citing State v. Ryans, 513 So.2d 386, 387 (La.App. 4 Cir.1987), writ denied, 516 So.2d 366 (La.1988). A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, 677. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Baxley, 94-2984 656 So.2d at 979; State v. Hills, 98-0507, (La.App. 4 Cir. 1/20/99), 727 So.2d 1215, 1217.
In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La.C.Cr.P. art. 894.1, and whether the sentence is warranted under the facts established by the record. State v. Trepagnier, 97-2427, p. 11 (La.App. 4 Cir. 9/15/99), 744 So.2d 181, 189; State v. Robinson, 98-1606, (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 127. If adequate compliance with La.C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Ross, 98-0283, (La.App. 4 Cir. 9/8/99), 743 So.2d 757, 762; State v. Bonicard, 98-0665, (La.App. 4 Cir. 8/4/99), 752 So.2d 184, 185, writ denied, 99-2632 (La.3/17/00), 756 So.2d 324.
In State v. Major, 96-1214 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, writ denied, 98-2171 (La.1/15/99), 735 So.2d 647, this court stated:
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D).
708 So.2d at 819.
In State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608, the Louisiana Supreme Court stated:
On appellate review of sentence, the only relevant question is "`whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959 (quoting State v. Humphrey, 445 So.2d 1155, 1165 (La. 1984)), cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes "punishment disproportionate to the offense." State v. *467 Sepulvado, 367 So.2d 762, 767 (La.1979). In cases in which the trial court has left a less than fully articulated record indicating that it has considered not only aggravating circumstances but also factors militating for a less severe sentence, State v. Franks, 373 So.2d 1307, 1308 (La.1979), a remand for resentencing is appropriate only when "there appear[s] to be a substantial possibility that the defendant's complaints of an excessive sentence ha[ve] merit." State v. Wimberly, 414 So.2d 666, 672 (La. 1982).
Id.
Defendant was convicted of attempted second degree murder, a violation of La. R.S. 14:27 and La. R.S. 14:30.1, and the sentencing range is from ten to fifty years at hard labor, without benefit of parole, probation or suspension of sentence. As previously stated, he was sentenced to thirty-five years at hard labor.
The record fully supports the sentence. The defendant struck the victim in the head with a hammer no less than ten times. She sustained a depressed fracture of the skull from which part of her brain protruded and also a life threatening skull fracture on the top of her head. Additionally, she sustained numerous fractures of her right hand, perforations of her bladder and colon, as well as extensive bruising and abrasions over her entire body. The damage to the victim's brain has forever impaired her memory and she is left with aphasia, which will permanently cause her difficulty comprehending speech and speaking. The defendant viciously attacked the victim and left her for dead. Considering the harm done to the victim and, consequently, society, it cannot be said that the sentence shocks the sense of justice. Trial counsel was not ineffective, and this assignment is meritless.
Turning to the defendant's pro se assertion of ineffective assistance of counsel for failure to file pre-trial motions, the record does not support his assertions. On June 1, 1999, defense counsel filed motions to suppress confession, evidence and identification, to which the State filed answers. Although there is nothing in the record to indicate that the court ever ruled on the motions to suppress the confession and identification, defendant suffered no prejudice. There was no confession, nor was there a line-up, show-up or photographic line-up. The victim told the first officers on the scene the name of her assailant, and neighbors supplied a clothing description of the defendant. As for suppression of the evidence, the only item "seized from the defendant" was the hammer he used to bludgeon the victim. Again, the defendant is unable to demonstrate any prejudice because, as more fully discussed in Pro Se Assignment of Error Number 1, the officers seized the hammer at the crime scene pursuant to the "plain view" exception to the warrant requirement.
Finally, the defendant maintains that counsel was ineffective by failing to subpoena witnesses Lionel Sennette and his sister, Rhonda Robichaux, on his behalf. The defendant does not indicate how Mr. Sennette would have testified but inasmuch as there were no witnesses to the attack, other than the victim and the defendant, the possibility Mr. Sennette's testimony would have exculpated the defendant is extremely remote. On the other hand, the defendant claims that his sister would have corroborated his testimony, because she would have explained that he and the victim were lovers, and that he had no reason to attack the victim. Even assuming Ms. Robichaux would have testified as the defendant maintains, the jury heard the tape of the neighbor's 911 call in *468 which the neighbor stated she heard the victim's screams as the defendant beat the victim for more than four hours. The chances of any favorable impressions offered by Ms. Robichaux would have been eclipsed by the weight of the evidence establishing the defendant's guilt.

PRO SE ASSIGNMENT OF ERROR NUMBER 1
In his first pro se assignment of error, the defendant claims that his Fourth Amendment rights were violated in that the hammer introduced into evidence at the trial "was illegally and unlawfully obtained without a valid search warrant and was not obtained incidental to a valid arrest and/or search, and without probable cause."
The right of every person to be secure in his person, house, papers, and effects, against unreasonable searches and seizures is guaranteed by the United States and Louisiana Constitutions. U.S. Const. amend. IV; La. Const. art. I § 5. The defendant maintains that because he was not arrested at his residence, the officers needed a search warrant to enter the premises.
Officers Michael Agustus and Larry Singleton, the first officers to arrive on the scene, testified that as they walked up the driveway toward the back door of the residence, they noticed droplets of blood on the ground and porch steps. They knocked on the back door, and could hear someone moaning inside. When the victim opened the door she was covered with blood, told the officers the name of her assailant, and explained that she had been beaten with a hammer. The officers "swept" the apartment for their safety to verify that the assailant was not still on the premises.
The Louisiana Supreme Court sanctioned the ability of a police officer to conduct a protective sweep under similar circumstances in State v. Guiden, 399 So.2d 194, 199 (La.1981) cert. den. 454 U.S. 1150, 102 S.Ct. 1017, 71 L.Ed.2d 305 (1982), which quoted from United States v. Agapito, 620 F.2d 324, 336 (2nd Cir.1980) cert. den. Agapito v. United States, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980) as follows:
The reasonableness of a security check is simple and straightforward. From the standpoint of the individual, the intrusion on his privacy is slight; the search is cursory in nature and is intended to uncover only "persons, not things." United States v. Bowdach, 561 F.2d 1160, 1168 (5 Cir.1977). Once the security check has been completed and the premises secured, no further search be it extended or limited is permitted until a warrant is obtained. From the standpoint of the public, its interest in a security check is weighty. The delay attendant upon obtaining a warrant could enable accomplices lurking in another room to destroy evidence. More important, the safety of the arresting officers or members of the public may be jeopardized. Weighing the public interest against the modest intrusion on the privacy of the individual, Pennsylvania v. Mimms, 434 U.S. 106, 108-09, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); Terry v. Ohio, 392 U.S. 1, 20-21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a security check conducted under the circumstances stated above satisfies the reasonableness requirement of the Fourth Amendment.
The officers were thus justified to make a limited protective sweep of the premises to verify that there was no one else in the residence who could have posed a threat to the officers or who could have destroyed evidence. The question then becomes whether the officers exceeded the scope of the permitted search. This is a *469 fact question, which must be considered in the context of the "plain view" exception to the warrant requirement.
Application of the plain view doctrine requires that the following conditions be met: (1) there must be a prior justification for an intrusion into a protected area, (2) in the course of which evidence is discovered inadvertently, and (3) where it is immediately apparent without close inspection that the items are evidence or contraband. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (FN1); State v. Brown, 370 So.2d 525 (La.1979). The "plain view" doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).
In the instant case, a juvenile flagged down the officers and informed them someone needed assistance. The officers noticed blood on the ground and porch of the defendant's residence, and heard the victim moaning. They noticed blood on the floors and walls of apartment, and learned that the victim had been beaten with a hammer. For their safety and preservation of evidence, the officers conducted a security "sweep" of the apartment. In "plain view" they found a bloody hammer near the back door.
Considering that the victim was badly beaten, covered with blood, and told the officers the defendant beat her, it was reasonable for the officers to assume that the bloody hammer was evidence of the crime.
The hammer was properly admitted as evidence because it was seized pursuant to the "plain view" exception to the warrant requirement. This assignment is without merit.

PRO SE ASSIGNMENT OF ERROR NUMBER 2
Next, the defendant contends the State impermissibly withheld exculpatory evidence. He argues that Detective Baudier learned from Charity Hospital on March 17, 1999, that the victim's rape test results were negative, yet testified at the preliminary hearing on April 8, 1999, that he was not aware of the test results. This assignment has no merit.
In response to the defendant's Motion for Bill of Particulars and Discovery and Inspection, the State supplied the defense with copies of all NOPD reports and testing results. The detective testified at the preliminary hearing that he did not know the rape test results, as the NOPD crime lab had not yet completed its testing. At trial the State elicited testimony showing that the NOPD crime lab reported the victim's rape test results as negative. Moreover, the defendant is unable to demonstrate any prejudice because he was acquitted of the rape charge.

PRO SE ASSIGNMENT OF ERROR NUMBER 3
By this assignment, the defendant argues that the State elicited fraudulent testimony. He points to discrepancies between the investigating officers' testimonies and that of the victim, concerning how she arrived at the defendant's apartment, and complains that the State failed its duty to correct the victim's false testimony.
Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); State v. Nash, 475 So.2d 752 (La.1985). Defense counsel cross-examined the State's witnesses including the victim, delving into the differences in their testimony. It was then incumbent upon the *470 jury, not the State, to reconcile or otherwise weigh the testimony.

PRO SE ASSIGNMENT OF ERROR NUMBER 4
In a fourth assignment, the defendant complains the State suppressed or destroyed evidence that would have proven the victim's testimony false. The evidence included a photograph of the victim and defendant together, negative fingerprint testing on the hammer, and the results of drug screening performed on the victim when she arrived at the hospital. This assignment has no merit.
The State introduced the victim's medical records at trial. Although the medical evidence shows that the victim's blood was tested for commonly abused controlled substances, Dr. Renatta Osterdock testified that those test results were not included in the victim's medical records. The record indicates that the State subpoenaed all of the victim's records from Charity Hospital and there appears to be no explanation as to why particular test results were not included. Nevertheless, there is nothing in the record to suggest that the State "suppressed" those test results. Moreover, the State straightforwardly elicited testimony concerning the omission of some testing results and the lack of a plausible explanation for the omission.
The defendant contends the picture bore a romantic inscription from the victim, which would have discredited her testimony that she and the defendant were never lovers. Although the picture was lost at some point prior to trial, all of the officers who viewed the photograph testified they did not recall seeing an inscription on the back of the photo. Moreover, the victim testified there was an inscription, but nothing more than "From your friend, J". The jury heard the defendant's testimony to the contrary, and chose to credit the victim's testimony instead.
As for fingerprint testing on the hammer, the defendant correctly notes that the test results were negative. However, the negative results are of no moment, inasmuch as the defendant admitted arming himself with the hammer to fend off the victim's alleged retaliatory attack.

PRO SE ASSIGNMENT OF ERROR NUMBER 5
In this assignment, the defendant argues that his Fifth Amendment right against self-incrimination was violated. He rejects his trial testimony, denying that he hit the victim with the hammer, and claims that his testimony was "the result of a secret and brutal interrogation."
Other than the defendant's contentions of coercion and brutality, which he raises for the first time on appeal, there is nothing in the record to support these allegations. Although the defendant claims his trial testimony was inculpatory, it was not. To the contrary, he related a set of circumstances and sequence of events clearly intended to exculpate him. In fact, he went as far as claiming he acted in self-defense.

CONCLUSION
For the above reasons the defendants conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] There is a discrepancy in the spelling of the defendant's name. The State spells his first name with only one "s". However, the defendant's signature on his pro se brief records his first name as "Bartholomess".
[2] To protect the identity of the victim, and her mother, who testified at trial, only initials will be used to identify some of the parties.
[3] The State played the tape of the 911 call. The caller identifies herself as the defendant's neighbor, and tells the police operator that the defendant began beating his girlfriend around noon. The caller heard the girlfriend screaming, and when the screaming stopped at about 4:00 p.m. the caller dialed 911.