996 So.2d 1177 (2008)
STATE of Louisiana
v.
Allen SIMMONS.
No. 08-KA-269.
Court of Appeal of Louisiana, Fifth Circuit.
October 28, 2008.
Rehearing Denied December 1, 2008.
*1178 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Laura Schneidau, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Katherine M. Franks, Louisiana Appellate Project, Abita Springs, Louisiana, for Defendant/Appellant.
Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY, and MADELINE JASMINE.
*1179 MADELINE JASMINE, Judge Pro Tempore.
The defendant, Allen Simmons, has appealed his conviction of second degree murder for the murder of his 18-year old stepdaughter, Latoya Williams. For the reasons that follow, we affirm.

FACTS
At trial, Sylvia Williams testified that at the time of the murder in June of 2004, there were several family members living in her house at 3841 Deer Run Drive in Harvey, Louisiana. These included her daughter, Latoya Williams, her daughter, Shontrice Mosely, and her young children, her nephews, Sky and Desmond, and her 14 year old son, Irwin. The defendant, Albert Simmons, her ex-husband, was still living with her in June of 2004.
Ms. Williams testified that on June 14, 2004, the date of the murder, she took the defendant to work, leaving her house at 6:30 a.m. She returned home to dress for work and before she left, the defendant returned to the house, due to rain canceling his job. Ms. Williams testified that her oldest daughter, Shontrice, drove her to work.
Shontrice Mosely testified that in 2004 she lived at 3841 Deer Run Lane. She corroborated her mother's testimony that she drove her mother to work on June 14, 2004. Ms. Mosely testified that she returned home and went back to bed. She testified that she last saw Latoya Williams on the morning of June 14, 2004, when she was preparing a bottle for her baby. Ms. Mosely testified that she left for work at about 12:15 p.m., leaving her children, her cousins, Latoya, and the defendant in the house. Ms. Mosely explained that as was her custom, she called the house later that afternoon to check on her children. She testified that she had a bad feeling because no one answered the telephone, despite her repeated calls. After making about 50 calls, her two-year old son finally answered the telephone around 4:30 p.m. Ms. Mosely returned home and saw her son in the window, crying. As she unlocked the front door with her key, she saw what she thought was a spill next to the refrigerator. Over the banister, she saw a puddle of blood.
Ms. Mosely testified that she knew something was not right so she ran to a neighbor's house and called the police, explaining that she was too scared to retrieve her children from the house. Ms. Mosely testified that while waiting outside, she saw the defendant and her cousin, Sky Cooper, walking up the street. She testified that the defendant was wearing a bloody shirt and was covered with scratches. Ms. Mosely testified that she expressed concern for Latoya and the defendant said "I hope nothing happened to her" and "I hope she's not dead." She fell in Sky Cooper's arms and cried. The police retrieved her children from inside the house.
Desmond Williams testified that in June of 2004, he lived with his aunt, Sylvia Williams, on Deer Run in Harvey. He testified that about 4:00 a.m. on June 14, 2004, he and Sky were picked up by a van and brought to work on sanitation trucks. Sometimes he and Sky worked on the same truck; however, on this particular day they did not work on the same truck. Mr. Williams testified that when he returned home from work at approximately 1:00 p.m., he spoke briefly to Latoya. Mr. Williams testified that when he entered the hall bathroom to take a shower, he saw the defendant in the master bedroom; however, following his shower, he did not see the defendant in the house. He testified that he did not know if defendant was still in the house when he left.
Sky Cooper testified that he also lived with his aunt, Sylvia Williams, on Deer Run during this time. He testified that he *1180 was picked up for work on the morning of June 14, 2004. He was given a ride home, but when he got to the house after work he could not get in. Mr. Cooper explained that he did not have a key to the house and usually the garage door was left open if no one was home. The door was locked on this particular day. Mr. Cooper testified that he sat outside to wait and saw the defendant walking in the grass, coming from the back yard. Mr. Cooper testified that the defendant looked shaken up and related that he had been robbed by knife point in the park. Mr. Cooper testified that defendant's hand was cut and he was bleeding. Mr. Cooper testified there was blood on defendant's shirt. Defendant asked Mr. Cooper to go with him to look for the alleged robbers. Mr. Cooper explained that they did not see the robbers in the park, so they went to a convenience store to get a snack. When they returned to the house, Shontrice ran out, crying and saying that there was blood inside the house. The police were at the house. Mr. Cooper testified that he was concerned about the blood on defendant so he asked the police to speak privately with him. Mr. Cooper testified that he told police that the defendant had been bleeding and possibly had something to do with the matter.
Deputy Terry Green, testified that he in 2004, he was employed with the Jefferson Parish Sheriff's Office (JPSO), and responded to an emergency call by a resident stating there was blood in a house. Deputy Green testified that upon entering the house, he saw blood in the kitchen that appeared to be "everywhere." He testified that he saw a pair of shorts and underwear near the back door and observed a trail of blood, which he followed to a closet. Deputy Green explained that as he opened the door of the closet, he saw an arm from underneath a piece of clothing and a blanket, covered in blood, was in a pile on the floor. The victim was covered by the blanket; she did not appear to be breathing and was not moving. Deputy Green testified that the victim was nude from the waist, wearing only socks on her feet. Deputy Green also saw blood in the master bedroom and bathroom.
Deputy Green testified that when he went outside the residence, the defendant asked to speak to him. During this conversation, Deputy Green observed blood on the defendant's shirt and cuts on his hands. The defendant explained his cuts and bloody shirt by telling the police that he had just been injured in an armed robbery. The defendant told police that he did not report the armed robbery. The defendant was taken to the detective bureau for questioning.
Detective Jeffrey Rodrigue, the lead detective in this investigation, oversaw the collection of physical evidence at the scene, including a knife covered with what appeared to be blood. Detective Rodrigue testified that from viewing the evidence, it was clear that a struggle had taken place. A substance that appeared to be blood was seen in the foyer, hallway, kitchen, den, and on the curtains covering the sliding door in the back of the house. Detective Rodrigue identified sketches and photographs of the crime scene, as well as evidence taken from the scene on the night of the murder. These included a large kitchen knife, a pair of shorts and panties that were covered with blood, and another pair of shorts. There was a palm print on a kitchen cabinet. Due to the poor lighting, the cabinet was cut and the print was taken to the investigations bureau in order to determine if the print matched the print provided by defendant while he was being questioned.
Detective Rodrigue testified that after he returned to the detective bureau, he was informed that the bloody palm print was a preliminary match to the defendant. *1181 He applied for a search warrant for the body of the suspect, Allen Simmons. Rodrigue observed cuts on both of the defendant's hands. After the search warrant was granted, police obtained a buccal swab from the defendant for purposes of DNA testing.
Virgil McKenzie, retired from JPSO, after being qualified as an expert in the field of fingerprint identification, testified that he was called to the crime scene on June 14, 2008 to give his opinion on whether fingerprints and palm prints in the home could be used for identification. He observed a bloody palm print on the kitchen counter. Due to poor lighting on the scene, this comparison could not be done on location. Crime technicians cut off the portion of the countertop for further investigation.
After comparing the prints, in his expert opinion, McKenzie concluded that the bloody palm print on the kitchen cabinet belonged to the defendant. His assistant, Lieutenant Patricia Adams, performed an independent examination and agreed with that conclusion.
Joel O'Lear, also a member of the JPSO crime laboratory, was accepted as an expert in the science of fingerprints. He used a different identification and matching to determine that the bloody palm print matched that of the defendant taken on his arrest register. Mr. O'Lear, in describing the process of identifying prints, noted the "incredible amount of information in this print to make a match."
Detective Eddie Klein, JPSO, interviewed the defendant on the day of his arrest. After explaining the defendant's constitutional rights to him, the defendant waived these rights and gave a voluntary statement. In his statement, the defendant said that he left the house at 3:00 p.m. He went to the park and a "dude drawed a knife" on him and robbed him of $60.00. He told police that when he left the house, Latoya was fine.
After the tape recorder was turned off, Detective Klein informed the defendant that the bloody palm print was his and asked him how he could deny being inside the house. In response, the defendant said he could not deny it, but did not want to talk about it. At this point, the interview was terminated.
Dr. Susan Garcia, a forensic pathologist and assistant coroner for Jefferson Parish, testified that she performed an autopsy on the body of Latoya Williams. The cause of death was multiple stab wounds. In all, there were seven stab wounds to the victim's body. The victim did not die from her wounds instantly.
Captain Timothy Scanlan of JPSO, who was qualified as an expert in crime scene reconstruction and blood stain pattern analysis, provided lengthy testimony regarding the blood splatters in the house. As a likely indicator of sexual assault, he noted that the victim's underwear and shorts were found turned inside out and left in the middle of the bloodshed. Because the victim was found, dead, in the closet, wearing only a bra, police considered that the state of the crime scene was consistent with sexual assault.
Bonnie Dubourg, of the JPSO DNA laboratory, was qualified as an expert in forensic DNA analysis and serology. She testified as to the results of DNA testing performed on evidence collected at the crime scene. The rape kit examination of the victim tested positive for seminal fluid; however, since there was no sperm in the fluid, it was not possible to perform DNA testing. Swabs of physical material collected on the scene tested positive for human blood. Ms. Dubourg testified that the DNA tested from the blood on the knife and on the palm print was consistent with the victim's blood. DNA testing on a *1182 towel found in the master bedroom was consistent with the victim's blood and the defendant's blood. Ms. Dubourg testified that on every sample she tested the blood was either from the victim or the defendant.
After the state rested, the defense presented the testimony of James McGhee, the victim's boyfriend, to support its assertion that the whereabouts of McGhee at the time of the murder could not be confirmed. Mr. McGhee testified that on the day of the murder, he worked at a body shop. He stopped at the victim's home to pick up breakfast she made for him on the way to work. He testified that he left work about 3:15 p.m. on June 14, 2004 to go to a muffler shop. He acknowledged that this time differed from that of his statement given to police wherein he stated he went to the muffler shop at 1:00 p.m. He also testified that at about 3:30 or 4:00 p.m. he left with a co-worker to get material to repair a car. Mr. McGhee testified that he left work about 7:30 or 8:00 p.m. and went to the victim's house. He gave a voluntary taped statement and buccal swap for DNA analysis. Taped statements from Mr. McGhee's co-worker and boss were admitted into evidence and corroborated Mr. McGhee's testimony.
At the conclusion of this judge trial the defendant was found guilty of second degree murder. Sentencing delays were waived and he was sentenced to the mandatory life term. The timely appeal followed.

LAW AND DISCUSSION
On appeal, the defendant contends that the trial judge erred in failing to reverse the denial of the Motion to Suppress[1] when it became apparent at trial that critical evidence was seized prior to the execution of the warrant, that the illegally seized evidence was used to provoke a statement from Mr. Simmons and that the officers testifying at the suppression hearing had colored facts when testifying at both the suppression hearing and the trial. The defendant contends that his Fourth, Fifth and Fourteenth Amendment rights were violated by the officers' actions and by the introduction of the illegally seized evidence and the statement not attenuated from it.
The burden of proof is on the State to prove the validity of evidence seized without a warrant. LSA-C.Cr.P. art. 703(D). By statute, an evidentiary hearing in connection with a Motion to Suppress should not be held except when the defendant alleges facts that, if true, would entitle him to relief. LSA-C.Cr.P. art. 703(E). Furthermore, the defense bears the burden of asserting a basis for this Motion to Suppress in order to provide the State with adequate notice so that it may respond to the specific defense challenges. State v. Jackson, 04-1388, p. 5 (La.App. 5 Cir. 5/31/05), 904 So.2d 907, 911, writ denied, 05-1740 (La.2/10/06), 924 So.2d 162.
For these reasons, a defendant is limited on appeal to the grounds articulated in his Motion to Suppress or raised at the hearing on the motion. A new basis for relief, even a meritorious one, cannot be raised for the first time on appeal. State v. Smith, 94-120, p. 6 (La.App. 5 Cir. 5/31/94), 638 So.2d 452, 455. In this case, the State urges this Court to apply this procedural bar to this appeal because the *1183 issue that the evidence was improperly seized before a search warrant was obtained was not raised below. However, in the interest of justice, we have reviewed the merits of defendant's claim.
Since there are no written Motions to Suppress in this case, at appellate defense counsel's request, this Court ordered the district court to clarify the parameters of the oral suppression motion. By stipulation, the parties agreed that there was an oral motion "to suppress all the evidence subject to suppression."
A review of the record on appeal reveals that on March 1, 2007, the court took up a Motion to Suppress in which the defendant urged the court to suppress his statements. At that hearing, Sergeant Eddie Klein testified that he spoke with the defendant at the detective bureau on June 14, 2004 in connection with the death of Latoya Williams. He advised the defendant of his rights verbally and informed him that he was under investigation for murder. These constitutional rights were also provided to the defendant in writing.
Sergeant Klein testified that after being informed of his constitutional rights, the defendant signed the waiver of rights form. He voluntarily gave a statement to police, which was recorded and later transcribed. At the time he gave the statement, the defendant was not promised anything of value for his statement, was not threatened, and was not under the influence of any drugs or alcohol. Sergeant Klein testified that in his statement, defendant detailed his actions on June 14, 2004, stating he was the victim of a violent armed robbery earlier that afternoon and that this explained the cuts on his person. Sergeant Klein testified that after the recorded statement, he informed defendant there was a bloody palm print found in the kitchen that matched defendant's palm print and he told defendant it was impossible for him to deny "being inside on the scene". Sergeant Klein testified that defendant responded "I cannot deny it but I don't want to talk about it."
The trial court denied the Motion to Suppress the defendant's recorded transcribed statement based on the testimony describing how the statement was obtained. After additional questioning, finding that the non-recorded oral statement was made after the defendant had been duly advised of his rights, was not coerced, and was not in distress, the court denied the Motion to Suppress the defendant's non-recorded oral statement.
During the course of the first Motion to Suppress hearing, the defense verbally stated an intention to suppress physical evidence as well. Sergeant Klein stated that the defendant voluntarily requested that the police take his clothing in order to perform DNA and serology tests. The defendant also volunteered to provide personal evidence for the rape kit. The waiver of rights of arrestee, as well as the transcribed statement, was introduced into evidence. As shown by the rights of arrestee form, the defendant was aware that he did not have to give these items to the police. In the recorded transcribed statement defendant stated they could take his shirt and do DNA testing on it and it would show that is was his blood on the shirt.
A search warrant for the home was obtained the day after the murder, June 15, 2004, authorizing the police to remove DNA or forensic material, as well as other evidence relevant to the investigation. At the second Motion to Suppress hearing held on May 17, 2007, the defense urged the illegality of the seizure of the defendant's bloody shirt and the DNA swab given by him. The defense apparently also challenged the seizure of evidence pursuant to the search warrant issued the following day. After hearing testimony, *1184 the trial court specifically found that the search warrant was valid and upheld the evidence seized.
In connection with this appeal, the defendant contends that the police improperly searched his home without a warrant. On appeal, he now asserts, for the first time, that twelve items taken from the home during the time the home was being searched on the night of the murder and before the search warrant was obtained should have been suppressed. The defendant also argues that his unrecorded voluntary statement was made as a consequence of the illegal search and that this statement should therefore have been suppressed as fruit of the poisonous tree.[2] Defendant did not make these arguments below; however, we have reviewed the defendant's claims and find them to be without merit.
We find the evidence seized on the night of the murder and before the search warrant was properly obtained without any infringement on defendant's constitutional rights.
On appeal, the defendant places great reliance on the holding of Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The Supreme Court in Mincey expressly rejected any doctrine of a "murder scene" exception. The defendant correctly notes that a murder scene exception to the warrant requirement does not apply. We find, however, that other constitutional exceptions to the warrant requirement apply.
Generally, the Fourth Amendment to the United States Constitution and Article I of Louisiana's Constitution prohibit police from making a warrantless entry into a private dwelling. One exception to the warrant requirement is where voluntary consent has been obtained, either from the property owner or from a third party who possesses common authority over the premises. Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).
In this case, a resident of the home not only consented, but actually requested that the police enter her home. The fact, undisputed below, that consent was given by a resident of the home is critically important. Indeed, the Supreme Court of Louisiana specifically noted that Mincey did not address a situation where an occupant of the premises had summoned police and approved of the investigation. State v. Brady, 585 So.2d 524, 528 (La.1991).
In State v. Dowling, 387 So.2d 1165 (La.1980), the defendant and his wife called police and reported a shooting in their home. The wife requested emergency assistance from the police. When the police arrived, the defendant watched, without commenting, as the police searched the room where the shooting took place. While conducting a search of the attic for possible bullet holes, the police saw a large number of marijuana plants. The court upheld the warrantless seizure of the marijuana plants under the plain view doctrine. Id. at 1170.
In the case at bar, the police responded to an emergency call made by a resident of the home, Shontrice Mosely. She told the police that after opening the front door with her key, she saw large amounts of blood inside the house. She backed out and called the police, requesting an immediate emergency response. When the police arrived, she requested that they retrieve her two young children from inside the home. In response to her request for help, the police opened the unlocked door *1185 and looked for victims of violence, as well as young children.
When the police made their emergency entry into the home, as requested by the resident, they saw puddles of blood in several rooms, as well as a bloody trail leading to the closet where the victim's body had been stashed. During this lawful entry, the defendant's bloody palm print on the kitchen countertop was in plain view of police officers.
Thus, we find that the police entry and ultimate seizure of forensic evidence was fully supported by the lawful consent of a resident.
In addition to the consensual entry into the house, another exception to the warrant requirement applies: exigent circumstances. The Supreme Court of the United States identifies exigent circumstances as "a plausible claim of specially pressing or urgent law enforcement need." Illinois v. McArthur, 531 U.S. 326, 331, 121 S.Ct. 946, 950, 148 L.Ed.2d 838 (2001). The Supreme Court of Louisiana has further explained that "[e]xigent circumstances may arise from the need to prevent the offender's escape, minimize the possibility of a violent confrontation which could cause injury to the officers and the public, and preserve evidence from destruction or concealment." State v. Brisban, 00-3437, p. 5 (La.2/26/02), 809 So.2d 923, 927, emphasis added.
The Supreme Court has affirmed the right of police to make warrantless entries into premises where the officers "reasonably believe that a person within is in need of immediate aid. ...." Mincey, at 392, 98 S.Ct., at 2413. Police officers are also authorized to make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. Id.
The Supreme Court of Louisiana has consistently enforced the constitutional requirement that police generally need a warrant to enter a home. The Court also reiterated that "warrantless searches will be allowed when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant." State v. Warren, 05-2248, p. 9 (La.2/22/07), 949 So.2d 1215, 1224. The Court cited as an example situations where the police
reasonably fear[ ] for the safety of someone inside the premises. The safety of others is a particular concern when police respond to a report of a crime in progress, and, in such a situation, police judgments regarding warrantless entries `should be afforded an extra degree of deference.'
Id., internal citations omitted.
A nonconsensual emergency police entry was upheld in Brigham City, Utah v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 1947, 164 L.Ed.2d 650 (2006). In upholding the warrantless entry, the Supreme Court observed that, "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." The Court emphasized that the "role of a peace officer includes preventing violence...." Id. at 406, 126 S.Ct. at 1949.
The officers in this case had a reasonable belief that someone in the home was in need of immediate assistance. The police officers' consensual, invited entry was an emergency law enforcement response. Until officers found the lifeless body of Latoya Williams, hidden in a closet at the end of a bloody trail, the source of the puddles and splatters of blood or the condition of the victim was not known. If the victim had been found alive, officers could have facilitated a quick response from emergency medical personnel. It was also abundantly obvious to the responding police officers that the very young children *1186 inside the home should be removed from the crime scene.
The testimony in this case supports the actions of the police officers in entering the home. With all of these facts showing the need for an immediate emergency response, it is clear that there was no abuse of discretion in the trial court's denial of defendant's Motion to Suppress.
Further, the bloody palm print was in plain view of the officers responding to the emergency call. When the responding police officers, from their lawful vantage point, saw the unconcealed bloody palm print on the kitchen countertop, it was immediately apparent that they had important forensic evidence before them. The discovery of such probative evidence warranted its immediate preservation.
This Court has recently emphasized the application of the plain view doctrine: evidence in open or plain view of a police officer legally on the premises is subject to seizure without a warrant. State v. Nicholas, 06-903, p. 6 (La.App. 5 Cir. 4/24/07), 958 So.2d 682, 698.
Police may seize evidence under the plain view doctrine when: (1) there is prior justification for an intrusion into the protected area and (2) it is immediately apparent, without close inspection, that the items seized are evidence or contraband. Horton v. California, 496 U.S. 128, 135-136, 110 S.Ct. 2301, 2307, 110 L.Ed.2d 112 (1990). The plain view doctrine is a recognized exception to the rule that a search or seizure conducted without a warrant is presumed to be unreasonable. Coolidge v. New Hampshire, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971); State v. Smith, 07-815 (La.App. 5 Cir. 3/11/08), 982 So.2d 821.
The case of State v. Robichaux, 00-1234 (La.App. 4 Cir. 3/14/01), 788 So.2d 458, writ denied, 01-1178 (La.3/15/02), 811 So.2d 897, is illustrative of the application of constitutional principles. In Robichaux, the warrantless seizure of a bloody hammer was upheld under the plain view doctrine. Police officers were informed that someone in a nearby home needed assistance. Upon responding to the emergency call, the officers saw blood on the ground and porch of the defendant's home and heard the victim moaning. Upon entering the house, officers saw blood on the floors and walls and learned that the victim had been beaten with a hammer. For officer safety and preservation of evidence, the officers conducted a security sweep of the premises. As they did so, in plain view, the officers found a bloody hammer near the back door. The seizure of this bloody hammer was upheld on appeal.
Similarly, we find the police entry into the home where Latoya Williams was stabbed to death was lawful and the officers presence inside was constitutionally valid. Once inside, the bloody palm print was in plain view from the officers lawful vantage point. When officers saw this bloody palm print at the crime scene, its value as probative forensic evidence was self-evident. The seizure of the bloody palm print resulted in the "major gain in effective law enforcement" foreseen by Coolidge.[3]
On appeal, the defendant characterizes the police investigation as unsupported by either a search warrant or consent. He argues that the police entered the home for the sole purpose of looking for incriminating evidence against him. After reviewing the facts elicited during the motion hearings and the trial, we find that this argument is flawed. The police were given consent to enter the home by a resident who requested their aid in an emergency. Under this special situation, *1187 the entry into the home clearly constituted exigent circumstances. After the entry, the plain view sighting of a bloody palm print had manifest evidentiary value and the decision to preserve it was solid police work.
In Soldal v. Cook County, Ill., 506 U.S. 56, 66, 113 S.Ct. 538, 546, 121 L.Ed.2d 450 (1992), the Supreme Court applied the principles of consent or exigent circumstances, combined with a plain view seizure, in clear language:
Suppose, for example, that police officers lawfully enter a house, by either complying with the warrant requirement or satisfying one of its recognized exceptions e.g., through a valid consent or a showing of exigent circumstances. If they come across some item in plain view and seize it, no invasion of personal privacy has occurred.
The police officers in this case were invited to enter the home under emergency circumstances. The officers were lawfully inside the home when they saw evidence of forensic significance, including the bloody palm print on the kitchen counter. The subsequent seizure of this important forensic evidence does not offend the Constitution.
In conclusion, we find that the seizure of evidence from the home where Latoya Williams was murdered was justified by lawful entry, followed by the plain view seizure of incriminating evidence. The defendant has not established that the trial courts denial of the Motions to Suppress constituted an abuse of the courts great discretion. For these reasons, we find no error in the trial courts denial of defendants Motions to Suppress.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990). The review reveals no errors patent.

CONCLUSION
For the foregoing reasons, the defendant's conviction is affirmed.
AFFIRMED.
NOTES
[1] A Motion to Suppress should be in writing. State v. Royal, 255 La. 617, 232 So.2d 292 (1970). In this case, it is conceded by both parties that no written Motion to Suppress was ever filed. Nonetheless, the State did not object to the procedural deficiency and two suppression hearings were held. Because the trial court took up the Motion to Suppress, this Court may review that ruling. State v. Davis, 02-1008, p. 5 (La.App. 5 Cir. 2/25/03), 841 So.2d 952, 958, writ denied, 03-0948 (La.11/7/03), 857 So.2d 516.
[2] The exclusionary rule bars as fruit of the poisonous tree physical and verbal evidence obtained during or as a direct result of an unlawful invasion. State v. Nicholas, 06-903, p. 6 (La.App. 5 Cir. 4/24/07), 958 So.2d 682, 687.
[3] Coolidge at 467, 91 S.Ct. at 2039.