MICHAEL E. KIRBY, Judge.
 

 |
 
 STATEMENT OF CASE
 

 On October 28, 2004, Brandon Tillman (“Tillman”) was indicted by an Orleans Parish Grand Jury for having “COMMITTED SECOND DEGREE MURDER
 
 *66
 
 UPON ARIEL BROWN” on March 26, 2004. Tillman appeared for arraignment on November 5, 2004, and was appointed counsel.
 

 On January 26, 2005, Tillman filed several motions. The trial court denied a motion to suppress statement after a hearing that day. The trial court denied motions to suppress statements and evidence on March 18, 2005. On June 16, 2005, the trial court granted the State’s
 
 Prieur
 
 motion to admit evidence of another crime.
 

 On August 21, 2006, a jury was impaneled but trial was recessed until the next day. The following day, Tillman moved to reconsider the decision on the State’s
 
 Pri-eur
 
 motion. This motion was denied. On August 23, 2006, the trial court postponed trial pending Tillman’s writ to this Court from the August 21, 2006 denial of his motion to reconsider admission of the
 
 Pri-eur
 
 evidence. The trial court noted that the impaneled jury had not been sworn in and dismissed the jurors |2from service. On April 10, 2007, the trial court recorded this Court’s denial of Tillman’s writ in case no. 2004-K-1451.
 

 A new jury was picked on July 16, 2007, and trial began the following day. On July 19, 2007, the jury returned a verdict of guilty.
 

 Tillman filed motions for new trial and post judgment verdict of acquittal on November 29, 2007. These motions were heard and denied the following day. On December 3, 2007, Tillman received a life sentence without benefit of parole, probation or suspension of sentence. He now appeals his conviction.
 

 STATEMENT OF FACT
 

 Testimony of Dr. Paul McGarry
 

 Dr. Paul McGarry is an expert forensic pathologist with the Orleans Parish Coroner’s office. On March 27, 2004, he performed an autopsy on the corpse of Ariel Brown (“Ariel”), the victim in this case.
 

 Dr. McGarry’s autopsy revealed that Ariel died from a gunshot to the head. The bullet entered the forehead above the left eye and stopped in the brain, immediately underneath the cranium above the right ear. Small punctuated markings or black gunpowder marks and sparse stippling
 
 [1]
 
 surrounded the entry wound, indicating the gun was fired at close range but did not contact the skin.
 

 The examination also revealed that Ariel was healthy and would have expected a normal life. An abrasion on her elbow due to scraping against a rough surface would have occurred from falling on pavement. Ariel’s left hand thumbnail and right hand index fingernail were broken. Also, abrasions and a 13smail laceration of the opening of the vagina indicated sexual activity shortly before death.
 

 During the autopsy, specimens of fluid were tested. These tested positive for marijuana. No other drugs or alcohol were present. Swabs from the body also tested positive for the presence of semen and sperm cells. Ariel’s fingernails were also preserved Dr. McGarry preserved the fingernails in case they were broken in a struggle and Ariel was able to scratch a person or thing, leaving part of whatever she scratched under her nails. Dr. McGarry requested or recommended testing the nails, but was not aware if a test had been performed because the decision to test was not his to make.
 

 911 call
 

 The State introduced a recording of two 911 calls from March 26, 2004, the night of
 
 *67
 
 the murder. This tape was played for the jury. The first call was made at 10:55 p.m.
 

 Testimony of Shaun Ferguson
 

 Shaun Ferguson was the first lead homicide detective assigned to this case. He investigated the crime scene at the corner of Horace and Patterson Streets on March 26, 2004. He arrived at approximately 11:34 p.m. Ariel’s body was still at the scene. Her shirt was torn.
 

 As Ariel’s purse and jewelry were left at the scene, Det. Ferguson opined that robbery was not the motive for the murder. Nothing appeared to have been taken.
 

 14A computer search of Ariel’s name revealed that she had been the victim of domestic abuse involving false imprisonment and battery by Tillman. An order had been issued to Tillman to stay away from Ariel. A computer search of Tillman’s name revealed that an outstanding warrant existed for him
 
 [2]
 
 . This information led the investigation to Tillman’s home, which was located on East Homestead, some ten blocks from the crime scene. It was approximately 12:35 a.m. Tillman showed no reaction when Det. Ferguson informed him of Ariel’s death. Det. Ferguson inquired about Tillman’s whereabouts that night. The interview continued at the Fourth District station.
 

 At approximately 12:40-12:45 a.m., Tillman gave a statement. He stated that he was home all night. He also denied seeing Ariel since January 2004. When Det. Ferguson confronted Tillman with conflicting information that he had received from his lieutenant, Tillman changed his story, stating that he had left the house to go to the corner grocery store and buy beer at approximately 11:30 p.m. Tillman also stated that he had spoken to a neighbor named Ray for a few minutes on the way home.
 

 When the police confronted Tillman a third time, informing him that a witness had seen him with Ariel on the night of the murder, Tillman continued to deny seeing Ariel, but changed his story again, stating that he had gone to a friend’s house for an hour or two. Tillman identified the friend only as “B”, stating that he did not know B’s full name. Tillman could not tell the police where B lived.
 

 The police did not test Tillman’s hands for gunshot residue during the interview at the Fourth District station. Det. Ferguson explained that Tillman was |Rnot then a suspect. Det. Ferguson gave the same explanation for not recording Tillman’s statements.
 

 A search warrant for Tillman’s home, where he lived with his mother and brother, was subsequently obtained. The search produced four weapons — two hand guns, a rifle, and a shotgun, but no other evidence.
 

 Det. Ferguson also took a “Buccal swab” — an oral slide of DNA saliva and four Q-tips of samples — from Tillman. Det. Ferguson requested a comparison of this evidence to the sexual activity kit taken from Ariel’s autopsy. A subpoena was also issued for phone records from the home of Renesha Brown (“Renesha”), Ariel’s cousin, as well as from Tillman’s house. These records revealed that a phone call had been made from the Tillman’s house to Renesha’s residence at approximately 6:07 p.m. that lasted some twenty-nine minutes.
 

 Det. Ferguson located Renesha at a nightclub on the night of the murder. Renesha lived in the Fourth District, in the Woodland Apartments on Sandra Drive, within two miles of the murder scene.
 

 
 *68
 
 On cross-examination, Det. Ferguson testified that he interviewed one of several 911 callers. One interviewee informed him that she heard a gunshot, looked in the direction from whence it came, and saw a car fleeing. The police searched the street in the vicinity of where the car fled, but the search produced no evidence. A car fitting the description of the fleeing car was discovered, but it turned out not to be the same car.
 

 Upon being recalled to the stand by the State, Det. Ferguson testified that Tillman gave several statements to him but never informed him that he had been with Ariel the day she was killed.
 

 |fiOn cross-examination, Det. Ferguson testified that he was aware of the stay away order, prohibiting Tillman from being with Ariel, prior to going to his house. Det. Ferguson also testified that he did not know whether he would have arrested Tillman for violating the stay away order had he admitted they had been together. He reasoned that arresting Tillman would not necessarily be his course of action until he knew what was going on.
 

 Testimony of Crystal Ruffin
 

 Crystal Ruffin is Ariel’s mother. She last saw her daughter on the day she died.
 

 Though she did not recall the exact date, Ms. Ruffin recalled an incident identified to her as occurring on June 20, 2003. It began when Ms. Ruffin’s mother and she went to Tillman’s house at approximately 11:25 or 11:35 p.m. on that date and attempted to gain entry. Over a four hour period, they attempted to enlist the assistance of the police, who were reticent to enter the house at first because no one appeared to be inside. However, the event culminated in the police kicking in the door to the Tillman residence. Once inside, they discovered Ariel. Blood was on her shirt, her braids were pulled out of her hair, and her face was swollen. Ms. Ruffin saw only Tillman and her daughter exit the house. However, Tillman and two other men were arrested.
 

 Testimony of Ed Derinyer
 

 Ed Deringer is a former New Orleans Police Department detective. On September 1, 2004, Det. Deringer took over the investigation of this case from Det. Ferguson.
 

 |7As part of the investigation, Det. Der-inger re-interviewed Tillman and re-arrested him. This time, Tillman admitted to being with Ariel on the night she died and stated that they had intimate relations that night. Tillman stated that he took Ariel to Renesha’s house before walking home to his house. This statement was not recorded because, “[t]his [was] during the initial preinterview.”
 

 Det. Deringer also searched a vehicle belonging to Brian Steptore, a neighbor of Tillman. The search occurred in September, several months after Ariel Brown’s death. The search produced several substrate samples to compare with Ariel’s clothing. A sample of what appeared to be blood was determined not to be human after testing.
 

 In his investigation, Det. Deringer drove the distance between Renesha’s house and the murder scene. The drive took eight minutes, going the speed limit and observing all signs. Det. Deringer noted at trial that there was a ten minute difference between the time Ariel was last seen with Tillman and “when the call regarding a gunshot wound and a woman down in the street had occurred.”
 

 On cross-examination, Det. Deringer testified that a witness who had “seen a vehicle matching that description leaving the apartment complex” never identified Tillman in a photographic lineup.
 

 
 *69
 
 Renesha told Det. Deringer that Tillman and Ariel left her apartment at approximately 10:45 p.m. She also informed him that she had immediately called a friend after the couple left her house. Review of Renesha’s telephone record showed a call was made from her house at 10:50 p.m.
 

 When asked if he questioned Renesha about why Det. Ferguson’s report indicated that she had told that the couple left at 10:15, Det. Deringer did not | srecall. However, he explained that witnesses often “don’t understand time” because it is subjective.
 

 Testimony of Latoya Brown
 

 Latoya Brown is Ariel’s sister. She testified that Tillman and Ariel Brown dated for approximately two years.
 

 Testimony of Officer Brandon McDonald
 

 Officer Bi’andon McDonald responded to Tillman’s house in the June 20, 2008 incident. He responded between 11:00 p.m. and 1:00 a.m.
 

 The door had to be kicked in. Upon entering, Officer McDonald saw hair— pieces of long braids — on the floor. A man came out from the back of the house with his hands up. A woman with a bloody nose also came out from the back. The woman was crying, and her face was swollen. The braids of hair on the floor matched the woman’s hair. Officer McDonald recalled the man’s name was “Brandon.”
 

 On cross examination, Officer McDonald testified that the braids were fake and had been “pulled out.” No weapons were found in the house.
 

 Testimony of Renesha Brown
 

 Renesha Brown is Ariel’s cousin. She was on probation for a federal “bank larceny” conviction at the time of trial. On March 26, 2004 — the date of the murder— Ariel was at Renesha’s apartment all day until approximately eight o’clock. Ariel was in the living room on the sofa, using the phone, while Renesha was in her room, lying down. Ariel spoke to Tillman on the phone the whole time | Sshe was at Rene-sha’s apartment. Renesha lived with her son and her boyfriend, Cornelius.
 

 Ariel returned to Renesha’s apartment at approximately 10:15, with Tillman. They were dropped off by a friend with a car. Tillman had just gotten out of jail some six or seven days earlier. Tillman and Cornelius had a history of fighting. Cornelius had been in jail “when all that happened.” Cornelius told Tillman that he had heard about his physical violence toward Ariel, and the two men began arguing. Renesha asked Ariel to leave with Tillman before anything happened. She also told Cornelius to leave. Cornelius left with a friend just before Ariel and Tillman left at approximately 10:30. Renesha did not see Ariel again. After everyone left, Renesha called a friend.
 

 On cross examination, Renesha testified that she went after Ariel to tell her to let Tillman go on. However, the couple was gone. She also testified that she was certain Ariel and Tillman left her apartment sometime after 10:00.
 

 Testimony of Officer Kenneth Leary
 

 Officer Kenneth Leary is a firearms examiner assigned to the New Orleans Police Department’s crime laboratory. Officer Leary examined the bullet and several fragments recovered during Ariel’s autopsy and four weapons that were submitted to the crime laboratory for testing. Officer Leary concluded that the bullet recovered from Ariel did not match any of these weapons.
 

 110Testimony of Darlene Winifield
 

 Darlene Winifield was a case manager with the Orleans Parish Criminal District Court’s domestic violence program. In that job, Ms. Winifield acted as a probation
 
 *70
 
 officer and instituted stay away orders. Tillman was one of her cases.
 

 Tillman first reported to Ms. Winifield on August 8, 2003, for a false imprisonment conviction. Ariel was the victim. In December, 2003, Ariel contacted Ms. Wini-field, alleging Tillman had violated a protective order. Tillman was arrested on December 2, 2003, for violating the protective order. He was released on December 12, 2003. However, due to an error involving fines and fees, Tillman was arrested a second time on January 6, 2004. He was not released again until March 18, 2004.
 

 Testimony of Jennifer Schroeder
 

 Jennifer Schroeder works for the New Orleans Police Department’s DNA laboratory. She performs DNA analysis and interpretation, and is an expert in the field of molecular biology and forensic DNA analysis.
 

 Ms. Schroeder tested a vaginal swab, a blood stain from Ariel, and a buccal swab from Tillman. Skin cells from the vaginal swab tested consistent with the blood stain from Ariel. Sperm cells taken from the same vaginal swab tested consistent with the buccal swab from Tillman. These results prove Tillman and Ariel engaged in sexual relations.
 

 Testimony of Marilyn Cahee
 

 InMarilyn Joycelyn Cahee is Tillman’s mother. In 2004, she lived on East Homestead Drive with her husband, Anthony Lewis, and her two sons, Tillman and Chad. Ms. Cahee described Tillman as quiet and shy.
 

 On Friday, March 26, 2004, Ms. Cahee worked from 6:30 a.m. to 4:00 p.m. Tillman was home when she returned at 4:00. She did not recall what time Tillman left that evening. However, she recalled that he returned at 9:58 p.m. She recalled the time he returned because she was in the kitchen cooking when he came home and because she looked at the clock as she had to get to work at 7:00 a.m. the next day. Ms. Cahee also recalled Tillman leaving with two women in a white car. She did not recall telling the police that Tillman returned at 10:00 p.m. or 11:30 p.m.
 

 Testimony of Brandon Tillman (the defendant)
 

 Tillman dated Ariel for approximately two years. The couple argued “at times.” Tillman loved her but admitted that they argued “[a]t times.”
 

 The couple continued dating after the August 2003 stay away order was issued. Tillman denied that he was ever arrested for violating the stay away order. Rather, he testified that he was arrested in December 2003 for not paying fines and fees.
 

 Tillman saw Ariel some two days after getting out of jail on March 18, 2004. He opined that he saw Ariel some three times prior to her death.
 

 Tillman was with Ariel on the day she was killed. Neither of them had a car. They went to the house of Ariel’s friend Courtney by getting a ride with Courtney’s sister. Tillman did not know what time they went to Courtney’s house, except that it was evening. They were at Courtney’s house for approximately an |12hour to an hour and a half. While visiting Courtney, they went to the corner store. They then went to Renesha’s house, arriving sometime after 9:00 p.m.
 

 Tillman denied knowing they were going to Renesha’s apartment. When they got there, Renesha intimated that she did not want Tillman there. Therefore, Tillman told Ariel that he wanted to leave, and Ariel walked him to the gate. From the gate, Tillman walked home alone. Tillman thought Ariel was going back to Renesha’s apartment to play cards. Tillman was in Renesha’s apartment for no more than five minutes.
 

 
 *71
 
 It took Tillman approximately twenty minutes to walk home. When he got home, it was approximately 10:00 p.m., and he remained outside. He went inside briefly, but returned outside where the neighbors were socializing. He stayed outside socializing for some two hours before going inside between 11:30 and midnight.
 

 Some two and a half to three hours later, the police appeared. The police initially asked where Tillman had been that night. Eventually, they told him that Ariel had been killed. When the police came to his house that night, Tillman denied seeing Ariel that day. Not knowing what the police wanted, Tillman agreed to go to the police station for questioning. At the station, the police tested his hands for gunpowder residue but did not inform him of the results.
 

 Upon being asked about his reaction to being informed of Ariel’s death, Tillman responded:
 

 It was kind of hard to believe because I had been with her that day, you know, and then asking for them to come asking me this, like, your accusing me. I was very angry at the time.
 

 In court, Tillman denied killing Ariel Brown.
 

 | iaOn cross examination, Tillman testified that he was occasionally angry for being in jail between January 6 and March 18, 2004. He also admitted that during the June 2003 incident he pulled Ariel’s braids out and hit her nose with an open hand. He denied that Ariel wanted to leave his house during the incident. He had a neighbor come to the house to try to convince her to leave, but she did not want to go.
 

 When Tillman got out of jail on March 18, 2004, Ariel called him, and they met three times on three different days. No physical altercations occurred during this time.
 

 On the date of the killing, Ariel and Tillman spoke on the phone more than once. He could not remember if they spoke for long.
 

 The police arrived at the Tillman home sometime after 1:00 a.m. on the night of the killing. When asked where he had been during the day, Tillman told the police he had been in the neighborhood — he took a ride and returned home. Tillman explained that he denied being with Ariel because he knew he was violating the stay away order. However, he also testified that he told the police that he had left Ariel at her cousin’s apartment complex that night. He did not recall telling the police that had been home all night.
 

 Testimony of Diane Watkins
 

 On the night of Ariel’s death, Diane Watkins lived at 837 Odeon St., close to the corner of Horace and Patterson, where Ariel’s body was found. That night, Ms. Watkins was watching television with the lights off when she heard a loud noise that sounded like a truck. She was with her daughter, Tracy. They looked out and saw “people fussing.” Mrs. Watkins snuck out onto her porch, lying down, | H“because they was using a lot of profanity and they was cursing and fussing.” The “fussing” was “about money and drugs.”
 

 Ms. Watkins described an altercation between two men and a young woman. One man was demanding money, and the woman was promising to get him the money. The second man was encouraging the first to kill the woman. On cross, she testified that the woman was sitting in a car. As for the men, “one was standing out on the side and the other one was standing like towards her a little part.”
 

 Finally, Ms. Watkins returned inside her house and turned her lights on. When she
 
 *72
 
 turned her yard or porch light on, “they flew.” Before leaving, the men shot the woman. Ms. Watkins was afraid and called 911. She heard the truck stopping as it escaped around the corner. Ms. Watkins would not be able to recognize the men.
 

 Ms. Watkins did not speak to the police that night. Several days later, she went to the police station to give a description of the truck. She was informed that someone would contact her but no one ever did.
 

 On cross examination, she stated she did not remember whom she spoke to at the station. Ms. Watkins guessed that the incident occurred after 10:00 p.m., because they had “just recently looked at the news.” She also testified that many “incident[s]” occurred in that area and that she remembered all of them. She called 911 for most of them.
 

 Ms. Watkins has known' Tillman for a long time. He went to school with her children and she knew Tillman’s mother from work. However, she described herself as “a distant friend of the family.” Ms. Watkins became involved with this case when she was contacted by a former attorney of Tillman. She guessed that | iaTilIman’s mother had given the attorney her name. The ladies had discussed the case “when this first happened.”
 

 Testimony of Tracy Salvant
 

 Tracy Salvant is Ms. Watkins’ daughter. The two women live together.
 

 On the evening of March 26, 2004, Ms. Salvant did not hear anything. Her mother came to get her because she heard something happening outside. Ms. Sal-vant got to the front porch of their house and turned the light on. She saw a white truck driving away.
 

 Ms. Salvant and her mother reentered the house. Ms. Watkins called the police. Some twenty minutes later, Ms. Salvant saw police lights at the corner of Patterson and Horace and she walked down to the corner. Horace is a block from her house. A dead female body was lying in the middle of the street. She did not speak to any police at the scene because she did not want to get involved. Ms. Salvant saw her mother talk to some police at the crime scene.
 

 Ms. Salvant knew Tillman “[tjhrough family members.” She became involved with this case when Tillman’s previous attorney contacted her.
 

 Testimony of Captain Jerome Laviolette
 

 Captain Jerome Laviolette was a lieutenant in 2004 and responded to the crime scene at Horace and Patterson on March 26, 2004. When he arrived, Ariel’s body was still on the ground but no witnesses were present.
 

 The-on-the-scene investigation took approximately an hour and a half. At sometime after 12:30, the investigation team went to Tillman’s house because the lead investigator wanted to speak to him. Tillman’s house was within walking distance of the crime scene, some eight to ten blocks away.
 

 |1(iAt Tillman’s house, Ms. Cahee informed Lieutenant Laviolette that she was not certain but estimated that Tillman had left the house at approximately 7:00 or a little earlier that evening. Moreover, Ms. Cahee stated that Tillman returned home at approximately 11:30.
 

 Lieutenant Laviolette interviewed another son while he was at Tillman’s house. The other son advised that he had returned home around 10:00 and confirmed that Tillman returned home at approximately 11:00. Captain Jerome testified based on notes he took that evening.
 

 ERRORS PATENT
 

 The record shows no errors patent
 

 
 *73
 

 DISCUSSION
 

 ASSIGNMENT OF ERROR NUMBER 1
 

 Tillman argues that the evidence presented at trial was insufficient to convict him. He points to the lack of physical evidence connecting him to the crime. Further, he asserts that the evidence does not support the State’s theory that this was a revenge killing in retaliation for Ariel’s inducing his arrest for violating a stay away order. He argues that it cannot be inferred that he was with Ariel at the time of her death because he has presented a reasonable hypothesis that she was killed over a drug debt. In support, he points to Ms. Watkins’ testimony. Finally, Tillman asserts that his inconsistent statements to the police are not sufficient to support his conviction,
 
 citing State v. Savoy,
 
 418 So.2d 547 (La.1982).
 

 In analyzing sufficiency of the evidence arguments this Court has stated:
 

 In assessing the sufficiency of evidence to support a conviction, the reviewing court must determine whether, | ]7viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 309, 99 S.Ct. 2781, 2784, 61 L.Ed.2d 560 (1979);
 
 State v. Rose,
 
 607 So.2d 974, 978-979 (La.App. 4th Cir.1992),
 
 writ denied,
 
 612 So.2d 97 (La.1993). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime.
 
 State v. Mussall,
 
 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution; it must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.
 
 Mussall, id.
 

 State v. Everett,
 
 99-1963, pp. 5-6 (La.App. 4 Cir. 9/27/00), 770 So.2d 466, 470.
 

 In Everett this Court also addressed the jury’s role in making credibility determinations:
 

 It is not the function of the appellate court to reassess the credibility of witnesses or to reweigh the evidence; the reviewing court’s function is to determine the constitutional sufficiency of the evidence presented.
 
 State v. Johnson,
 
 619 So.2d 1102, 1109 (La.App. 4 Cir. 5/13/93),
 
 writ denied,
 
 625 So.2d 173 (La.10/1/93). Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the fact finder.
 
 State v. Brumfield,
 
 93-2404 (La.App. 4th Cir.1994), 639 So.2d 312;
 
 State v. Garner,
 
 621 So.2d 1203 (La.App. 4th Cir.1993),
 
 writ denied
 
 627 So.2d 661 (La.1993). Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency.
 
 State v. Jones,
 
 537 So.2d 1244, 1249 (La.App. 4 Cir.1989);
 
 Tibbs v. Florida, 457
 
 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness.
 
 Id.
 
 A trier of fact’s determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly | ^contrary to the evidence.
 
 State v. Vessell,
 
 450 So.2d 938, 943 (La.1984).
 

 Id.,
 
 99-1963, pp. 8-9, 770 So.2d at 471.
 

 Circumstantial evidence has been defined as “collateral facts and circumstances
 
 *74
 
 from which the existence of the main fact may be inferred according to reason and common experience.”
 
 State v.
 
 Williams, 99-223, p. 8 (La.App. 5 Cir. 6/30/99), 742 So.2d 604, 608,
 
 quoted in State v. Francois,
 
 2002-2056, p. 6 (La.App. 4 Cir. 4/9/03), 844 So.2d 1042, 1047. This Court has stated the following on circumstantial evidence:
 

 When a conviction is based on circumstantial evidence, such evidence must exclude every reasonable hypothesis of innocence. R.S. 15:438;
 
 State v. Camp,
 
 446 So.2d 1207 (La.1984). This is not a stricter standard of review, but it is an evidentiary guide for the trier of fact when it considers circumstantial evidence.
 
 State v. Porretto,
 
 468 So.2d 1142 (La.1985). If a rational trier of fact reasonably rejects the defendant’s hypothesis of innocence, that hypothesis fails; and, unless another one creates reasonable doubt, the defendant is guilty.
 
 State v. Captville,
 
 448 So.2d 676 (La.1984).
 

 State v. Fountain,
 
 93-2561, p. 4 (La.App. 4 Cir. 12/15/94), 647 So.2d 1254, 1256.
 

 In this case, the direct evidence clearly establishes that Ariel Brown was murdered. Dr. McGarry testified that she died from a bullet shot through her brain. Moreover, Dr. McGarry testified that sparse stippling surrounding the entry wound indicated that the shot was fired at close range. Dr. McGarry also noted that two fingernails were broken, offering the possibility of a struggle. Thus the physical evidence shows that Ariel was killed by a gunshot at close range and that there may have been a struggle. No evidence was introduced at trial that Ariel initiated any struggle, eliminating the possibility of self-defense. Accordingly, the close | grange shot supports the jury’s finding of the killer’s specific intent to kill Ariel Brown.
 

 The evidence of the murderer’s identity, however, is clearly circumstantial. Officer Leary testified that the bullet and bullet fragments recovered from Ariel did not match any of the weapons provided to him in the investigation. None of the evidence indicates that the murder weapon was ever found. Further, no witnesses testified that they saw who shot Ariel.
 

 However, the evidence clearly indicates that Tillman was the last person seen with Ariel. The direct evidence shows part of the timeline the date of the murder. Phone records recovered from Renesha Brown’s residence show that a phone call was made from Tillman’s home to her home at 6:07 p.m. and lasted some twenty-nine minutes. The first 911 call reporting the shooting was made at 10:55 p.m.
 

 At trial, Renesha testified that Ariel was at her apartment all day until approximately 8:00 p.m. She testified that Ariel spoke to Tillman the whole time. However, Renesha was in her bedroom, lying down, and Ariel was in the living room. Whether Ariel was on the phone entire day with Tillman may have been presumed by Renesha because when she saw Ariel, she was talking to Tillman. Nevertheless, a jury could reasonably conclude that Ariel and Tillman spoke for the twenty-nine minutes reflected in Renesha’s phone records. Renesha also testified that Ariel left her apartment around 8:00 p.m. and returned at approximately 10:15, with Tillman. At trial, Renesha testified that Ariel and Tillman left some fifteen minutes later, at 10:30.
 
 [3]
 

 
 *75
 
 IgpBoth Tillman and his mother attempted to challenge this timeline by testifying that he returned home at ten, long before the 10:55 p.m. 911 call was made. However, Captain Javiolette testified that he had interviewed Ms. Cahee on March 26, 2004, and she told him at that time that Tillman returned home at 11:30 p.m., over half an hour after the first 911 call.
 

 In addition to the timeline, Renesha testified that Tillman and her boyfriend, Cornelius, engaged in an altercation over Tillman’s treatment of Ariel. Tillman testified that Renesha did not want him in her apartment. It was within the jury’s purview to weigh this evidence and conclude that an altercation had taken place and that the altercation was over Tillman’s treatment of Ariel.
 

 In addition to the timeline, it is important to note that the evidence shows the murder scene, Renesha’s apartment, and Tillman’s home are all within walking distance. Ariel’s body was found at the corner of Horace and Patterson Streets, in the Fourth District. Detective Ferguson’s testimony reflected that Renesha lived only two miles from the murder scene. Tillman lived on East Homestead Drive. His testimony reflected an admission that he lived only twenty minutes from Rene-sha’s apartment. Thus, the geographic locations involved provided Tillman with the ability to murder Ariel within the timeline provided to the jury.
 

 Finally, the State also introduced evidence showing motive and modus operands Darlene Winifield was a case manager for the Orleans Parish Criminal District Court’s domestic violence program and testified that she supervised Tillman as of August 8, 2003, for a false imprisonment conviction involving Ariel. Ms. Winifield also testified that Ariel reported Tillman for violating a protective 12i order related to the conviction. Accordingly, Tillman was arrested on December 12, 2003. Tillman was released shortly thereafter, but was rearrested on January 6, 2004. Although the trial testimony reflected that the second arrest was related to non-payment of fines and fees, it was still connected to Ariel’s reporting the protective order violation. He was released on March 18, 2004, a little over a week before Ariel was killed. At trial, Tillman admitted on cross examination to occasional feelings of anger over being in jail from January 6 to March 18, 2004. This evidence shows Tillman had motive to seek revenge against Ariel.
 

 At trial, Crystal Ruffin, Ariel’s mother, and Police Officer Brandon McDonald testified regarding the false imprisonment crime. Ms. Ruffin managed to convince the police to kick in the door to Tillman’s house. Once inside, Ariel was found with injuries reflecting she had been beaten. Ms. Ruffin testified that Ariel’s fake hair braids had been pulled out of her hair, her shirt was bloody and her face was swollen. Officer McDonald responded to the scene and testified that Ariel had a bloody nose, and he observed braids on the floor of the house. This evidence of Tillman’s prior violence against Ariel combined with his three month stay in jail provided evidence of both motive and modus operandi to the jury.
 
 See State v. Rose,
 
 2006-402 (La.2/22/07), 949 So.2d 1236 (evidence of prior violence against a victim goes to motive and is extremely probative in a circumstantial case).
 

 Given the collateral facts of Ariel’s intentional murder, Tillman’s prior violence
 
 *76
 
 against Ariel, his release from jail shortly before her death resulting from her reporting a violation of a protective order, and trial testimony showing Tillman was with Ariel following an argument with her relatives over the way he treated her less than half an hour prior to her death, the jury was well within its discretion | agto use its reason and common experience to conclude he was the murderer. Further, evidence presented at trial about Tillman’s inconsistent statements to police undermined his credibility before the jury.
 

 However, Tillman argues that he has a reasonable hypothesis of his innocence. He argues that the testimony of Diane Watkins and Tracy Salvant shows that he was not the murderer. Ms. Watkins testified that she saw an argument between two men and a woman over drugs and money in the vicinity of where Ariel’s body was found. Ms. Salvant is her daughter and testified that she was there, but did not see the altercation — just a vehicle driving away. The jury apparently dismissed this testimony.
 

 Ms. Watkins testified that she would not be able to identify the two men involved in the altercation in front of her house. She also testified that she went to the police station at some point, but did not remember who she spoke to. Finally, she admitted to having known Tillman for a long time, though she referred to him as “a distant friend of the family.” However, she knew his mother through work, and Tillman went to school with her children. Credibility of witnesses is in the jury’s purview. Given that Ms. Watkins knew Tillman and could not even identify the perpetrators of the crime in front of her house, we cannot say the jury acted unreasonably in rejecting this hypothesis of innocence.
 

 The evidence, albeit circumstantial, when viewed in a light most favorable to the state, supports the jury’s guilty verdict. There is no merit to this assignment of error.
 

 |
 
 .^ASSIGNMENT OF ERROR NUMBER 2
 

 Tillman argues alternatively that if there is sufficient evidence to show that he killed Ariel, then his conviction should be reduced to manslaughter pursuant to La. C.Cr.P. art. 821(E), because he acted in the heat of blood. He reasons that the state’s theories of the case — 1) the murder happened during an incident of domestic abuse, and 2) the killing was in revenge for causing him to go to jail — show that he acted in the heat of blood.
 

 Pursuant to La.C.Cr.P. art. 821(E), this Court may reduce a conviction to that of a lesser and included offense if it finds that insufficient evidence exists to support the jury’s verdict. Tillman raises the affirmative defense that he acted in the heat of passion.
 

 The Louisiana Supreme Court has stated the following regarding sudden passion or heat of blood manslaughter:
 

 Manslaughter is a homicide which would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. La.R.S. 14:31(1). Thus, the presence of “sudden passion” or “heat of blood” distinguishes manslaughter from murder. The court has stated on several occasions, however, that “sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them.
 
 State v. Tompkins,
 
 403 So.2d 644 (La.1981);
 
 *77
 

 State v. Temple,
 
 394 So.2d 259 (La.1981);
 
 State v. Peterson,
 
 290 So.2d 307 (La.1974). Since they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in a “sudden passion” or “heat of blood” is entitled to a manslaughter verdict. Where such proof has been introduced, a second degree murder verdict is inappropriate.
 

 State v. Lombard,
 
 486 So.2d 106, 110 (La.1986).
 

 | ¿4This Court has noted that “sudden passion” or “heat of blood” are defined by Louisiana jurisprudence as provocation sufficient to deprive an average person of his self control and cool reflection.
 
 State v. Cheavious,
 
 2003-0706, p. 7 (La.App. 4 Cir. 11/19/03), 862 So.2d 135, 139. Such a provocation shall not reduce a homicide to manslaughter if the jury finds the offender’s blood actually cooled or that an average person’s blood would have cooled at the time the offense was committed.
 
 Id.
 

 Tillman bases his argument on the State’s two theories. As to the first— domestic abuse — Tillman does not point to anything Ariel did to provoke being killed or to invoke domestic abuse. As to the second theory — revenge for having him arrested — Tillman had plenty of time both in jail and within the week or so after he got out to have cooled down. Further, the jury apparently rejected any other argument — the fight with Cornelius or the rejection of Renesha — he may submit.
 
 [4]
 
 Such a determination goes to the weight of the evidence and not to its sufficiency.
 
 See Everett,
 
 99-1963, p. 3, 770 So.2d at 471. Accordingly, we likewise find that this argument has no merit.
 

 ASSIGNMENT OF ERROR NUMBER 3
 

 Tillman argues that La.C.Cr.P. art. 782(A), allowing for a conviction by a ten to two (i.e. non-unanimous) jury vote in a non-capital felony case, is unconstitutional in violation of the Sixth Amendment of the U.S. Constitution.
 

 As Tillman points out, the First Circuit addressed this issue in 2007 in the case of Derrick Todd Lee by stating the following:
 

 | a/fhe punishment for second degree murder is confinement for life at hard labor.
 
 See
 
 LSA-R.S. 14:30.1(B). Louisiana Constitution Article I, § 17(A) and LSA-C.Cr.P. art. 782(A) provide that in cases where punishment is necessarily at hard labor, the case shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. Under both state and federal jurisprudence, a criminal conviction by a less than [ — ] unanimous jury does not violate a defendant’s right to trial by jury specified by the Sixth Amendment and made applicable to the states by the Fourteenth Amendment.
 
 See Apodaca v. Oregon,
 
 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972);
 
 State v. Belgard,
 
 410 So.2d 720, 726 (La.1982);
 
 State v. Shanks,
 
 97-1885, pp. 15-16 (La.App. 1 Cir. 6/29/98), 715 So.2d 157, 164-165. The defendants reliance on
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002),
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and
 
 Jones v. United States,
 
 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), is misplaced. These Supreme Court decisions do not address the issue of the constitutionality of a non-unanimous jury verdict but rather, address the issue of whether the assessment of facts in determining an in
 
 *78
 
 creased penalty of a crime beyond the prescribed statutory maximum is within the province of the jury or the sentencing judge. These decisions stand for the position that any fact (other than a prior conviction) that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and approved beyond a reasonable doubt.
 
 See Apprendi,
 
 530 U.S. at 490, 120 S.Ct. at 2362-63. Nothing in these decisions suggests that a jury’s verdict must be unanimous. Accordingly, LSA-Const. Art. I § 17(A) and LSA-C.Cr.P. art. 782(A) are not unconstitutional and do not violate the defendant’s Sixth Amendment right to a trial by jury.
 

 State v. Lee,
 
 2005-0456, p. 3
 
 [5]
 
 (La.App. 1 Cir. 5/1607), 964 So.2d 967, 973,
 
 writ denied State v. Lee,
 
 2007-1288 (La.3/7/08) 977 So.2d 896,
 
 cert. denied Lee v. Louisiana,
 
 - U.S. -, 129 S.Ct. 130, 172 L.Ed.2d 37 (2008).
 

 la/The U.S. Supreme Court denied a writ in
 
 Lee
 
 on October 6, 2008.
 
 Id.
 
 Accordingly, La.C.Cr.P. art. 782(A)’s presumption of constitutionality remains in tact. Thus we find this argument has no merit.
 

 CONCLUSION
 

 The case against Tillman is circumstantial. However, we conclude that the record provides sufficient evidence for a rational jury to find guilt beyond a reasonable doubt based upon inferences made according to reason and common experience from the facts established at trial. Further, Tillman failed to show that he acted in sudden passion or the heat of blood, thus he has not shown that his conviction should be reduced to manslaughter. Finally, Tillman’s challenge to the constitutionality of La. C.Cr.P. art. 782(A) is erroneous and has been rejected by both the Louisiana and the U.S. Supreme Courts. Therefore, we affirm the defendant’s conviction and sentence.
 

 AFFIRMED.
 

 [1]
 

 . Sparse stippling is: "Punctuated markings of black powdery material around the entry hole on the skin.” Dr. McGarry explained, "[tjiny litde pieces of gunpowder embedded in the skin indicate that the wound was close range.”
 

 [2]
 

 . The warrant was invalid.
 

 [3]
 

 . During Det. Deringer's testimony, he testified that Renesha told him Ariel and Tillman left her apartment at 10:45. The defense questioned why Det. Ferguson's report indicated that she had previously stated they left at 10:15. Det. Deringer explained that wit
 
 *75
 
 nesses sometimes "don’t understand time” because it is subjective. Renesha testified on cross examination the she was sure the couple left sometime after 10:00 p.m. The jury heard these minor discrepancies. They are not large enough to undermine the evidentiary value of the timeline or overcome the jury's discretion to weigh it.
 

 [4]
 

 . Tillman points out in his third assignment of error that one juror voted for a responsive verdict of manslaughter. Accordingly, it is clear that the jury did consider manslaughter as a responsive verdict.
 

 [5]
 

 . Westlaw failed to include the First Circuit's page numbers.