DANIEL L. DYSART, Judge.
 

 | Nathaniel Payton appeals his conviction for manslaughter arguing that the there was insufficient evidence to sustain a responsive verdict of manslaughter, insufficient evidence for a finding that he was the perpetrator, and that the jury instruction allowing for a non-unanimous verdict is unconstitutional. For the following reasons, we affirm.
 

 Nathaniel Payton was charged by grand jury indictment on May 28, 2009, with the second degree murder of Cyril Roussel, a violation of La. R.S. 14:30.1. Defendant pleaded not guilty. The trial court denied defendant’s motion to suppress the evidence and identification. Defendant was found guilty of manslaughter on March 11, 2011, at the close of a four-day trial before a twelve-person jury. On April 9, 2010, the trial court denied defendant’s motion for new trial and sentenced him to forty years at hard labor. This appeal followed.
 

 The defendant was convicted of manslaughter in the killing of Cyril Roussel, who allegedly was shot by the defendant on August 2, 2008, and as a result of the wounds inflicted, died approximately six months later, on February 9, 2009.
 

 |2New Orleans Police Department Detective Bryan Patrick Mulvey investigated the shooting, which occurred at approximately 3:30 a.m. outside of a pizza bar called Club Decatur, located at the corner of Bienville and Decatur streets. Det. Mulvey interviewed a witness on the scene, then relocated approximately two blocks away to a parking lot near N. Front Street, in front of the Westin Hotel (behind Canal Place), where the defendant had been apprehended. Two police officers were guarding a gun there. Det.
 
 *596
 
 Mulvey identified clothing seized from the defendant — a white t-shirt, size 5-XL, with blood stains on the front and back, a pair of socks with blood stains, and a pair of sneakers with blood splatter on them. The defendant also had $781.99 on his person when arrested. Det. Mulvey identified a photograph of the gun.
 

 New Orleans Police Department Officer Jason M. Lewis testified that on August 2, 2008, he was assigned to the canine unit. He was driving in the French Quarter, on Iberville Street, near Club Decatur, when he heard what sounded like gunshots. At that time he also began to hear reports on the police radio of the shooting outside Club Decatur. He was proceeding up Iberville Street to N. Peters Street when he was flagged down by a security guard from the club, who pointed the defendant out to him. The defendant was walking very fast. Officer Lewis turned on his lights and siren to get through heavy vehicular traffic at N. Peters Street, at which point the defendant began to run.
 

 Officer Lewis crossed N. Peters on Iber-ville Street, paralleling the defendant as he ran across two connected parking lots. When the officer observed the defendant reach into his waistband and pull out a firearm, he stopped his vehicle, got his canine out, and ran into the parking lot after defendant. The officer ran through the gate across from the hotel entrance, and his canine apprehended lsNicholas Payton. Officer Lewis testified that Pay-ton dropped or threw the gun he was carrying, a Ruger semi-automatic handgun, and it landed in the middle of N. Front Street. Officer Lewis testified that from the time he saw the defendant walking fast until the time his canine apprehended defendant, he lost sight of him for only a brief second when he ran behind a building in the middle of the parking lots and emerged on the other side, still running parallel to the officer.
 

 Officer Lewis testified that the slide on the Ruger handgun was locked back. He had to leave the firearm in order to release his canine from the defendant. The officer instructed a security guard, who he did not know, to stand over the firearm for a few seconds until other police officers arrived.
 

 Leo Crump testified that he knew the victim, Cyril Roussel, from meeting him and his wife at parties in connection with the local music industry. On the night of August 2, 2008, Cramp attended two concerts with friends at the House of Blues on Decatur Street. After the first concert, he went to Club Decatur to get a slice of pizza and ran into Cyril Roussel. Roussel had attended the second show at the House of Blues, though not with Crump. After the second show Crump saw Roussel standing with other people across Decatur Street talking. Crump went into Club Decatur.
 

 Cyril Roussel subsequently entered, saying to someone Crump did not see: “I’m going to be right f.g here, you know. I ain’t going nowhere.” Crump described the words from the victim as words of arguing. Crump said he asked Roussel at that point, “Hey man, what’s wrong?” Roussel responded that nothing was wrong, and Crump said “[C]ool out. We having a good time tonight.”
 

 Crump and Roussel continued talking, with Crump’s back to the outer wall of Club Decatur, and Roussel facing Decatur Street. Someone appeared crouched |4down behind Roussel as they talked, and Crump heard a click. As soon as he heard a second click gunshots rang out. When Roussel was shot he ran about ten yards and fell over into the street. Crump called 911 and went right over to Roussel. Crump said he never saw a gun, nor did he see Cyril Roussel with a weapon. On cross-examination he was asked if he knew
 
 *597
 
 who the individual was “that was involved in the argument,” [with the victim]. He did not know. He also said he did not know who shot his friend. Crump replied in the negative when asked on redirect examination whether he had seen the shooter’s face. Crump said the shooting and scattering/running of people took a matter of seconds.
 

 Kiefer Brown testified that he was working as an armed security person at Club Decatur at the time of the shooting. He was inside when the shooting began. He looked outside and saw the victim, by that time on the ground, by some bushes, being shot more times by Nicholas Payton, whom he identified in court. The defendant’s gun jammed or ran out of ammunition, and he hurried away, putting the gun in his waistband. Brown followed him up Clinton Street to Iberville Street, where he encountered two security personnel from The House of Blues. He asked one of them to call the police. He continued to follow the defendant as he walked toward N. Peters Street. He said Payton turned and saw him, and took off running across N. Peters Street. Brown saw a police SUV and directed him to where he thought the defendant was running. Brown continued to chase the defendant, and observed him remove the gun from his waistband. The defendant then came back toward Brown, because the police canine was coming toward him. Brown said he grabbed the defendant, and the gun flew up in the air and hit a nearby fence. They [the police] handcuffed defendant, and Brown pointed out the gun to police. He|r,said that as soon as he turned the gun over to the police he ran back to Club Decatur.
 

 On cross-examination, Brown confirmed that he was within six feet of the shooter, and that the lighting at the scene was good. Brown conceded that the clothing he described the shooter as wearing, a white t-shirt and blue jeans, is common. Brown admitted that he did not tell police the shooter had tattoos on his arms or a scar on his face. Brown was asked by defense counsel to approach to within six feet of defendant, to look at defendant’s face, and to tell counsel whether he could see the scar running down the middle of defendant’s face. Brown said that facing defendant he could not see it go all the way down (suggesting that he could see part of it), but that when defendant turned his face he could see the full scar. Brown also admitted that he could see the tattoos on defendant’s arms. Officer Shelita Haynes, a New Orleans Police Department Crime Lab technician, was called out to the scene of the shooting, 232 Decatur Street, at the corner of Decatur and Bien-ville Streets. She identified photographs taken at the scene, including one of a silver-colored magazine and one of a black Ruger Model P90 handgun. Officer Haynes stated that the handgun was not photographed in the location in which it was found because it had been moved. She said she was told that the gun had been found when the perpetrator was apprehended.
 

 New Orleans Police Department Detective Regina Williams began investigating the shooting of the victim as a homicide on February 10, 2009, after the victim died. She interviewed a number of witnesses and submitted a request for testing on the gun and cartridge casings recovered.
 

 New Orleans Police Department Sergeant Byron Winbush, assigned to the Crime Lab as a Firearm Examiner, was qualified by stipulation as an expert in the | fifield of ballistics and firearms examination. Sgt. Winbush stated that microscopic comparison testing revealed that the copper bullet jacket fragment retrieved from the victim’s body during the autopsy
 
 *598
 
 showed that it was fired from the handgun seized at the scene of defendant’s arrest. Sgt. Winbush also testified that seven cartridge casings recovered at the scene during the investigation were fired from that handgun.
 

 Sgt. Winbush testified on cross examination that he had no idea whether a fingerprint analysis of the gun had been requested. He testified that in the past fingerprints had been recovered from firearms. Sgt. Winbush also testified that the New Orleans Police Department has gunpowder residue test kits, and he confirmed that it would be fairly easy to perform a gunpowder residue test on somebody who is taken into custody suspected of firing a gun. He did not know whether a gunpowder residue test was performed in the instant, case.
 

 Det. Bryan Patrick Mulvey, recalled as a witness by defendant, confirmed that on the night of the shooting there was evidence at two locations, in the 200 block of Decatur Street and in the parking lot a couple of blocks away where defendant was apprehended. He did not know whether a crime lab person ever went to the parking lot.
 

 Crime Lab Technician Shelita Haynes, recalled as a witness by the defense, testified that upon arrival at the scene of the shooting she photographed the scene as it appeared as instructed by another officer. No one asked her to take photographs of a parking lot in the 100 block of Bienville Street; she did not go to that location at all. She did not move the gun from that location to the scene of the shooting. An officer brought it to her at the Decatur Street scene of the shooting, 17advising her that it came from the location where the defendant was apprehended, the 100 block of Bienville.
 

 Det. Regina Williams, recalled as a witness by the defense, testified that Det. Bryan Mulvey was the lead detective on the case prior to her taking over the case as a homicide investigation upon the victim’s death. Det. Williams confirmed that when one has multiple scenes one has the Crime Lab process those multiple scenes. She confirmed that she had been on crime scenes where weapons were photographed by crime scene technicians and were dusted for fingerprints. She had no indication that Det. Mulvey had ever presented the victim with a photo lineup to identify the person who shot him. She did not believe that Det. Mulvey ever ordered any testing of defendant’s clothing or hands for gunpowder residue. Det. Williams’ report reflected that evidence, including a P-90 handgun, was recovered from the 200 block of Decatur Street, and that other evidence was recovered at University Hospital.
 

 Former Club Decatur security person Kiefer Brown, recalled as a witness by the defense, testified that he did not prepare a report on what occurred on the night of the shooting. He said he confirmed in his statement — presumably to police — that as he tackled defendant he heard the gun hit the fence.
 

 Former New Orleans Police Department Homicide Detective Melvin Winins, an investigator with the Orleans Parish Indigent Defendant’s Office, confirmed that he took some photographs in connection with the case. He identified the photos, including ones depicting outside surveillance cameras at Club Decatur, one on the right side of the building pointing downward toward Bienville Street, another one pointing down the sidewalk toward Iberville Street. The club is situated at the corner of Bienville and Decatur Streets. One photograph | ^depicted a surveillance camera near the House of Blues. Winins confirmed that if the event took place in front of 232 Decatur Street, one of the cameras
 
 *599
 
 on the Club Decatur would have shown approximately half the block. Winins conceded on cross examination that the photographs he took were taken over a year and a half after August 2, 2008, although he said the general area had not changed during that period. He confirmed that he was a private contractor and that he was expecting to be paid for the work he did. Winins stated on redirect examination that both scenes, outside the Club Decatur and at the location where the gun was found, should have been photographed on the night of the incident.
 

 Terrence Green testified that he had been friends with Nicholas Payton for fifteen years. He testified that on the day the defendant was arrested, the defendant had picked him up to go to a rap concert at the House of Blues. They attended the second show, and after the show went to Club Decatur. The front of the bar was crowded with people, spilling out onto the sidewalk on Decatur Street. They did not get pizza, which was sold in the back, on Bienville Street. They did not get any alcoholic beverages. Green had a beer or more at the House of Blues. He heard gunshots ring out, and the crowd scattered. Green said he was a few feet from the defendant when the shots rang out. He said the defendant was standing at the rear of the bar, by the pizza bar. Green did not see the shooting. He and the defendant ran towards Decatur Street — he corrected himself on cross examination, stating that they ran towards N. Peters Street. He said forty or fifty people were running. Green said he lost sight of defendant on Decatur, and was unable to reach him on his cell phone. Green said afterward that he got into a car of some acquaintances and left the scene. Green replied in the negative when asked whether the defendant shot anyone that night or whether defendant had a gun on 13his person that night. Green said he was familiar with an alley behind Club Decatur, and he replied in the negative when asked whether defendant ran in that direction.
 

 On cross examination, Green stated that he did not know if Nicholas Payton knew the victim. He confirmed that he was with the defendant all night up to the point when they split up as they ran from the shooting. He said he did not witness any interaction between the defendant and the victim before the shooting, nor did he see the actual shooting. Green said the shooting took place close to the corner of Bien-ville and Decatur Streets, and that at the time he and the defendant were standing at the rear of the club, in the pizza part, a half a block away. They ran on Bienville towards N. Peters Street, towards the parking lots on N. Peters. He said seventy to one hundred and twenty people were running from the scene. Defendant’s car was parked in what he described as the middle parking lot, meaning the one bordering the north side of Bienville Street. Green and defendant split up at N. Peters and Bienville Streets. He made it to defendant’s car, but he did not see defendant. Green also said he did not see police out there or a dog. He did not see anyone chasing defendant.
 

 Green was asked on cross examination for the names of the people with whom he rode from the French Quarter that night, after he was unable to contact the defendant on his cell phone. He said he did not recall their names, noting that he knew them and had seen them at the concert. He also saw a person named Tonya Wilkins in the rear of the bar prior to the shooting. She ran away from the scene with Green, and she subsequently entered a car occupied by some of her friends and left. Green said he spent about two minutes trying to contact defendant on his cell phone before leaving.
 

 
 *600
 

 \mERRORS PATENT
 

 A review of the record reveals that the trial court denied defendant’s motion for new trial and sentenced him without waiting twenty-four hours as required by La.Code Crim. Proc. art. 873.
 

 Louisiana Code of Criminal Procedure art. 873 provides that if a motion for new trial or motion in arrest of judgment is filed, sentence shall not be imposed until at least twenty-four hours after the motion is denied, unless the defendant “expressly” waives the delay or pleads guilty. However, it is well-settled that a defendant may implicitly waive the twenty-four hour delay.
 
 See State v. Pierre,
 
 99-3156, p. 7 (La.App. 4 Cir. 7/25/01), 792 So.2d 899, 903 (implicit waiver where defense counsel responds in the affirmative when trial court inquires if he is ready for sentencing). In
 
 State v. Robichaux,
 
 2000-1234, p. 7 (La. App. 4 Cir. 3/14/01), 788 So.2d 458, 464-465, at the beginning of the sentencing hearing, defense counsel noted: “Judge, prior to the sentencing, I would like to put on the record an oral motion for a new trial....” This Court held that “by virtue of the defense counsel’s statement, defendant announced his readiness for sentencing, which implicitly waived the waiting period.”
 
 Robichaux,
 
 2000-1234, p. 7, 788 So.2d at 465.
 

 Similarly, in the instant case the trial court asked defense counsel if he would like to be heard prior to sentencing. Defense counsel replied in the affirmative, bringing to the court’s attention a motion for new trial he had filed the previous day. The trial court denied the motion for new trial. Counsel for defendant then stated: “Okay. May I be heard with regards to sentencing?” | ^Defense counsel then proceeded to argue factors that could have affected the trial court’s sentence.
 

 Under these circumstances, just as in
 
 Robichaux,
 
 by virtue of defense counsel’s statements, defendant announced his readiness for sentencing following the trial court’s denial of his motion for new trial.
 

 ASSIGNMENTS OF ERROR NO. 1 & No. 2:
 

 In his first assignment of error defendant argues that the evidence was insufficient to support his conviction for manslaughter under La. R.S. 14:31(A)(1), in that the evidence was insufficient to show that he killed the victim in sudden heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Defendant’s second and related assignment of error is that the evidence was insufficient to support his conviction as to the issue of identity, that he was the individual who shot and killed the victim.
 

 This Court set forth the applicable standard of review for sufficiency of the evidence in
 
 State v. Huckabay,
 
 2000-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, as follows:
 

 In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Green,
 
 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime.
 
 State v. Mussall,
 
 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the ra
 
 *601
 
 tional trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.
 
 Mus-sall; Green; supra.
 
 “[A] reviewing court is not called upon to decide whether it believes the witnesses or | i2whether the conviction is contrary to the weight of the evidence.”
 
 State v. Smith,
 
 600 So.2d 1319 (La.1992) at 1324.
 

 In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.
 
 State v. Shapiro,
 
 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from
 
 Jackson v. Virginia, supra,
 
 but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt.
 
 State v. Wright,
 
 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the
 
 Jackson
 
 reasonable doubt standard.
 
 State v. Jacobs,
 
 504 So.2d 817 (La.1987).
 

 Huckabay,
 
 2000-1082, p. 32, 809 So.2d at 1111,
 
 quoting State v. Ragas,
 
 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-107.
 

 Defendant’s second assignment of error, relating to the sufficiency of the evidence as to defendant’s identity as the individual who shot the victim, will be addressed first.
 

 According to testimony given at trial by N.O.P.D. canine Officer Jason M. Lewis and Kiefer Brown, the security guard from Club Decatur, Nicholas Payton was the shooter. Both men followed Payton as he was leaving the scene. According to Brown, he never lost sight of the defendant, and according to Lewis, from the time he saw the defendant running until he was apprehended, he only lost sight of him for a brief moment.
 

 Brown actually saw Nicholas Payton standing over Cyril Roussel continuing to shoot until either his gun jammed or ran out of ammunition, which is consistent with Officer Lewis’s testimony that the slide on defendant’s gun was locked back when he found it. Kiefer Brown positively identified Nicholas Payton in court as the person he saw shoot the victim and who he chased.
 

 | ^Contrary to the testimony of Officer Lewis and Mr. Brown, the defendant’s friend of fifteen years, Terrence Green, testified that he was with the defendant the entire evening from the time they arrived at the House of Blues until the shooting. At that point, he lost contact with the defendant and could not reach him on his cell phone. He testified that the defendant was not carrying a gun that night.
 

 In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion.
 
 Huckabay,
 
 2000-1082, pp. 32-33, 809 So.2d at 1111,
 
 citing State v. Jones,
 
 97-2591, p. 7 (La.App. 4 Cir. 9/8/99), 744 So.2d 165, 169. A factfinder’s decision as to the credibility of a witness should not be disturbed unless it is clearly contrary to the evidence.
 
 Huckabay,
 
 2000-1082, p. 33, 809 So.2d at 1111,
 
 citing State v. Harris,
 
 99-3147, p. 6 (La.App. 4 Cir. 5/31/00), 765 So.2d 432, 435.
 

 Viewing all of the evidence in a light most favorable to the prosecution, any ra
 
 *602
 
 tional trier of fact could have found beyond a reasonable doubt that the defendant, Nicholas Payton, was the individual who shot Cyril Roussel, particularly in light of Mr. Brown’s eye witness testimony that he saw Nicholas Payton, whom he identified in open court, shooting Cyril Roussel.
 

 The defendant also argues as an assignment of error that the evidence was insufficient to support his conviction for manslaughter under La. R.S. 14:31(A)(1), in that the evidence was insufficient to show that he killed the victim in sudden heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Intertwined with this assignment of error is the issue of defense counsel’s objection, on the ground set forth in La. _jCode14 Crim. Proc. art. 814(C), to the inclusion of the statutorily-provided-for responsive verdict of manslaughter. La. Code Crim. Proc. art. 814(C) states:
 

 Upon motion of the state or the defendant, or on its own motion, the court shall exclude a responsive verdict listed in Paragraph A if, after all the evidence has been submitted, the evidence, viewed in a light most favorable to the state, is not sufficient reasonably to permit a finding of guilty of the responsive offense.
 

 Manslaughter is a responsive verdict to a charge of second degree murder, under La.Code Crim. Proc. art. 814(A). Defendant was charged with and tried for second degree murder. Prior to closing arguments, defense counsel moved to strike manslaughter as a responsive verdict, insofar as it would be based on sudden heat of passion or heat of blood under La. R.S. 14:31(A)(1). The trial court denied that motion, but stated that it agreed there was insufficient evidence to permit a finding of guilty of manslaughter insofar as so-called felony manslaughter, provided for by La. R.S. 14:31(A)(2), and thus that it had not intended to instruct the jury as to that ground.
 

 In
 
 State ex rel. Elaire v. Blackburn,
 
 424 So.2d 246, 251 (La.1982), the Court held that:
 

 [E]ven if the offense is legislatively designated as responsive by [La.C.Cr.P.] Article 814, the defendant may timely object to an instruction on a responsive verdict on the basis that the evidence does not support that responsive verdict. If the court overrules the objection and the jury returns a verdict of guilty of the responsive offense, the reviewing court must examine the record to determine if the responsive verdict is supported by the evidence and may reverse the conviction if the evidence does not support the verdict.
 

 Thus, generally, in a review of the sufficiency of the evidence to support a conviction of a responsive verdict of manslaughter in a prosecution for second degree murder, an appellate court should affirm the conviction if the evidence was sufficient to support the conviction for manslaughter.
 

 [ 15In the instant case, however, given that defense counsel objected to the inclusion of the responsive verdict of manslaughter, we must review the record to determine if the evidence was sufficient to support the conviction for manslaughter.
 

 Louisiana Revised Statute 14:31(A)(1) defines manslaughter, in pertinent part, as:
 

 A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to man
 
 *603
 
 slaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; ...
 

 Thus, the presence of “sudden passion” or “heat of blood” distinguishes manslaughter from murder. However, “sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them.
 
 State v. Tillman,
 
 08-0408, p. 28 (La.App. 4 Cir. 3/4/09), 7 So.3d 65, 76,
 
 citing State v. Lombard,
 
 486 So.2d 106, 110 (La.1986).
 

 Provocation is a question of fact that must be determined by the trier of fact.
 
 State v. Scott,
 
 09-0138, p. 7 (La.App. 4 Cir. 11/18/09), 26 So.3d 283, 288,
 
 writ denied,
 
 09-2773 (La.6/18/10), 38 So.3d 320. For a defendant to be entitled to the lesser verdict of manslaughter, he is required to prove the mitigatory factors by a preponderance of the evidence.
 
 Scott,
 
 09-0138, p. 7, 26 So.3d at 289. The jury may infer the mitigatory circumstances from the evidence.
 
 State v. Cheavious,
 
 03-0706, p. 8 (La.App. 4 Cir. 11/19/03), 862 So.2d 135, 140.
 

 | j/There is no jurisprudence directly holding that, under the circumstances presented by the instant case, a conviction for a responsive verdict of manslaughter may be upheld on a review for sufficiency of the evidence as to the mitigating factors by merely finding that, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that the State proved the mitigating factors by a preponderance of the evidence.
 

 However, that is precisely the standard of review defendant submits should be applied in the instant case. Defendant does not analyze the issue, but simply argues “[w]hen the evidence in this case is reviewed under the
 
 Jackson
 
 standard of review, it is apparent that while the elements of the offense of murder were proven beyond a reasonable doubt, the mitigatory elements to support a manslaughter verdict were not established, as required, by a preponderance of the evidence.”
 

 In
 
 State v. Batiste,
 
 06-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810, the defendant was charged with and convicted of manslaughter. He appealed, arguing that the evidence was insufficient to support his conviction for manslaughter, maintaining that the State failed to negate his self-defense claim. In reviewing his claim, this Court cited the rule that when reviewing a defendant’s claim that the evidence supports a manslaughter verdict, an appellate court must determine whether a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found that the mitigating/mitigatory factors were not established by a preponderance of the evidence.
 
 Batiste,
 
 06-0875, p. 8, 947 So.2d at 814-815. Immediately after citing the above principle of law, this Court stated “[h]ere, the appellant shot and killed the victim during a dispute over a bet in a dominos game; these facts would support a finding of manslaughter.”
 
 Batiste,
 
 06-0875, p. 8, 947 So.2d at 815,
 
 citing State v. Collor,
 
 99-0175 (La.App. 4 Cir. 4/26/00), 762 So.2d 96, 103. This Court then addressed the issue of self-defense, the issue upon which defendant based his claim that the evidence was insufficient to support his conviction for manslaughter.
 

 Batiste
 
 cannot be cited for the proposition that when a defendant challenges the sufficiency of his conviction for manslaughter based on provocation, the standard of review is whether any rational trier of fact,
 
 *604
 
 viewing all the evidence in a light most favorable to the prosecution, could have found beyond a reasonable doubt that the State proved the mitigating factors by a preponderance of the evidence. This would stand the review for sufficiency on its head.
 

 The State’s burden of proof is to establish beyond a reasonable doubt that the defendant committed manslaughter, and the only relevant manslaughter category is La. R.S. 14:31(A)(1). Thus, the review for sufficiency in the instant case entails determining whether, viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant killed the victim in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.
 

 In arguing his motion to strike/exclude the responsive verdict of manslaughter, defense counsel conceded that “the gentleman who was out there, [sic] said there may have been a brief argument,” but that that there was nothing that would have caused “a heat of passion argument about what happened out there.” The trial court stated that it saw a set of facts upon which the jury could potentially return a verdict of manslaughter, meaning based on sudden passion/heat of blood, and obviously referring to the argument between the victim and the unidentified individual.
 

 | ifjLeo Crump, the victim’s friend, who saw the victim that night at Club Decatur, was asked if at any point that night he saw the victim get into an argument with anyone. The following colloquy transpired between the prosecutor and Crump:
 

 A. I didn’t actually see an argument. I heard words from Cyril, which to me was [sic] words of arguing with someone. As I walked in — as I walked to Decatur, I passed a group of people that I know. I spoke to them. I went inside. There were people in there getting pizza and the young lady told the security guard made [sic] sure he don’t skip the line. And then when I went outside, the group that I was talking to, they went across me, and at that point Cyril came the other way through that crowd, and that’s when I heard him saying something, but I never saw who he was saying it to.
 

 Q. What did he tell you?
 

 A. He was like, “I’m going to be right f.g here, you know. I ain’t going nowhere.” And at that point I said “Hey, man, what’s wrong?” He was like nothing. I said cool out. We having a good time tonight.
 

 Q. And what happened after that?
 

 A. And we started talking. My back was to the club, facing Bienville Street. Cyril was — his chest was basically like— his shoulder was here and he was facing Decatur Street, on Bienville facing Decatur.
 

 Q. Okay. And /all were still talking at this point?
 

 A. Yes.
 

 Q. And what happened while /all were talking?
 

 A. As we were talking, someone appeared ducked down, squatted down, and I just heard click. And then as soon as I began to hear the second click, I was like watch out. It clicked again and then he started firing.
 

 The victim fell after being shot, and the shooter shot him several more times until either his gun jammed or he ran out of ammunition. The autopsy indicated that the victim was shot multiple times with a .45 caliber handgun; seven ejected cartridge casings were found at the scene.
 

 
 *605
 
 | [9There was no evidence that the defendant knew the victim. However, there was evidence, through the testimony of Leo Crump, that the victim had uttered an expletive, in a harsh, argumentative manner, in addressing an unknown individual — “I’m going to be right f.g here, you know. I ain’t going nowhere.” These words could have been construed by the jury as proverbial “fighting words.” The words suggested that the victim expected or was ready for a further confrontation with the individual, whom, the jury could rationally have inferred, was the defendant. In a sense, the words used by the victim could have been construed as a challenge to the defendant. The jury further could have inferred from Crump’s testimony that the victim was shot moments after the victim uttered those words, after talking with Leo Crump for those moments. It has already been determined that the evidence was sufficient to find that it was defendant who shot the victim multiple times with a .45 automatic handgun. Defendant apparently emptied all the bullets in his handgun into the victim — or at least fired all the bullets in his handgun at the victim — which, the jury could have inferred, indicated that defendant was incited and enraged.
 

 Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the defendant emptied his .45 automatic handgun into the victim in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.
 

 Defendant cites several cases where the reviewing court did not find sudden passion or heat of blood, including
 
 State v. Ebarb,
 
 558 So.2d 765 (La.App. 3 Cir.1990). There, the defendant and the victim, his girlfriend, had an argument in the front yard of the victim’s mother’s home. The victim yelled, and her mother and | ansister rushed to the front yard to find the defendant on top of her, beating her. The defendant was pulled off the victim, and he apologized to her. The victim went inside the residence and her mother helped her clean herself and change her bloodied blouse. The defendant followed them inside. Believing everything was all right, the mother and the sister went outside to the backyard with the mother’s boyfriend to eat. Defendant and the victim could be seen through a window talking. Between fifteen and forty-five minutes after the three adults went outside, they heard shots. They rushed inside to find the victim had been shot four times with a .22 caliber rifle defendant had brought with him from the victim’s residence. The defendant was in the process of fleeing.
 

 The defendant in
 
 Ebarb
 
 was charged with and convicted of second degree murder. On appeal he argued that the evidence was only sufficient to convict him of manslaughter. The appellate court rejected that argument, noting that defendant had apologized for beating the victim and that at least fifteen minutes elapsed between the fight and the shooting. The court noted that the victim’s family members felt the situation was under control, as evidenced by the fact that they left defendant and the victim talking together in the trailer while they went outside to eat. There was no evidence presented of an argument or struggle between defendant and the victim while they were alone inside the trailer.
 

 The facts of the instant case are distinguishable from those in
 
 Ebarb.
 
 In the instant case, the victim uttered what could have been interpreted as “fighting words” to someone at the Club Decatur, and it can be inferred from the evidence that it was only moments later that defendant shot
 
 *606
 
 the victim multiple times, shooting him first in his back. The jury could have inferred that the defendant was the individual to whom he had uttered those fighting words.
 

 | ⅞1 Defendant also cites
 
 State v. Johnson,
 
 06-623 (La.App. 3 Cir. 11/2/06), 941 So.2d 696, where the appellate court declined to reduce the defendant’s second degree murder conviction to manslaughter for the stabbing death of her husband. The defendant, her husband, the defendant’s sister, and another male drove from the defendant’s apartment to Leesville, Louisiana, to visit a friend, stopping along the way for alcoholic beverages and food. On the way to Leesville the defendant and her husband argued. The group left Leesville around midnight, and on the way home the defendant and her husband argued. At home the husband threw a Styrofoam cup containing an alcoholic beverage at the defendant, and he also struck her in her ear with his fist. The defendant exited the car, stating that no “MF hits me.” She and the defendant hit each other outside the apartment, and the defendant ran inside. Once inside the defendant kept asking her husband to leave, but he would not, instead sitting down on the couch. At some point the defendant went into the kitchen and returned with four knives, which she held at her sides. She told her husband to leave or she would cut him. Her husband stood up and said either “do it” or “I dare you,” and the defendant stabbed him.
 
 Johnson,
 
 06-623, p. 4, 941 So.2d at 700. Her husband said it did not hurt, but then fell down and ultimately died as a result of the wound.
 

 The appellate court in
 
 Johnson
 
 stated, as quoted by defendant in his appellate brief:
 

 Regardless of the words exchanged, “mere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter.” “Further, an argument alone will not be a sufficient provocation in order to reduce a murder charge to manslaughter.” (citations omitted.)
 

 Johnson,
 
 06-623, pp. 8-9, 941 So.2d at 702.
 

 122In
 
 Gauthier,
 
 a decision by this Court cited in
 
 Johnson, supra,
 
 the defendant was charged with and convicted of second degree murder. On appeal this Court rejected the argument that the evidence was only sufficient to support a conviction for manslaughter. In
 
 Gauthier,
 
 the victim and two friends were in the victim’s car preparing to leave a high school dance. As the victim attempted to back up his car, he noticed the defendant standing behind it. The victim told the defendant to get away from his car so he could move it. The defendant walked over to the driver’s side of the car and exchanged words with the victim. As the victim began to get out of his car, the defendant pulled out a gun, shot the victim twice, and fled. The victim’s friends said the victim did not threaten the defendant or do anything to provoke him, and that neither the victim nor either of them had a gun.
 

 The defendant in
 
 Gauthier
 
 testified that earlier in the evening he had accidentally bumped into the victim at the dance, and the victim had cursed him. He testified that when the victim told him to move away from the back of the car after the dance, he went to the side of the victim’s car because the victim was cursing at him again. The defendant testified that the victim reached under his car seat and pulled out a gun, and the defendant shot him in self-defense. The defendant said he fled out of fear that the victim’s friends would shoot him. No gun belonging to the victim was ever found.
 

 On appeal, the defendant first argued that the State failed to carry its burden of
 
 *607
 
 proving that he did not act in self-defense. Alternatively, the defendant argued that the evidence supported only a conviction for manslaughter. This Court rejected both arguments. As to the manslaughter argument, that it was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection, this Court stated:
 

 laJn this case, there was clearly no such provocation by the victim. Even assuming that defendant’s allegations are true that [the victim] cursed at him at the dance and when telling him to move out of the way of the car, these actions are certainly not the type of provocation which would justify shooting someone.
 

 Gauthier,
 
 546 So.2d at 654.
 

 Gauthier
 
 is distinguishable from the instant case. Here, the victim’s words suggested that he was ready for a further confrontation with the defendant, almost challenging him. As noted, the defendant apparently emptied all the bullets in his handgun into the victim — or at least fired all the bullets in the handgun at the victim — which, the jury could have inferred, indicated that the defendant was incited and enraged.
 

 Finally, defendant cites
 
 State v. Johnese,
 
 95,2104 (La.App. 1 Cir. 5/10/96), 674 So.2d 1175, where the First Circuit reversed, on the State’s appeal, the trial court’s granting of the defendant’s motion for post-verdict judgment of acquittal, whereby the trial court modified the verdict from second degree murder to manslaughter. In
 
 Johnese,
 
 the victim and his girlfriend were returning to his apartment complex. When his girlfriend tried to take a beer bottle away from him, it was dropped and broke by some stairs (it was determined that the victim’s blood alcohol level was .19). Some ten or so minutes later, as the victim and his girlfriend were leaving his apartment, the defendant was sweeping up the glass. Some glass hit the victim’s foot, and he and the defendant began arguing. The victim’s girlfriend said she tried three or four times to get the victim to leave, but he continued to argue with the defendant. The victim told the defendant, “Handle your business. You got (sic) any beef with me.”
 
 Johnese,
 
 95,2104, p. 3, 674 So.2d at 1176. The victim’s girlfriend said that just prior to the shooting the victim was walking between two parked cars in the parking lot with his hands in the air saying 124“handle your business.” She entered the victim’s car, then heard a shot and ran to the victim, who died from a single gunshot wound to his left temple.
 

 The defendant’s future brother-in-law, Brumfield, testified that when the defendant was sweeping up the broken glass the victim, who was upstairs at the time, told the defendant that he did not need to be slinging glass around like that. The defendant told the victim that kids played around there and he had to get the glass out of there. The two men argued for five or ten minutes. Brumfield testified that initially, when they heard the sound of breaking glass close to the stairs, the defendant had looked outside and told Brum-field that there was a gun in the victim’s pocket. He said that during the argument the defendant stepped inside to retrieve a .25 caliber pistol. He said the shooting occurred after the victim made a quick step toward the defendant. After the shooting the defendant was shocked. The defendant came inside, sat down in a bedroom closet, and cried.
 

 The defendant testified that he shot the victim in self-defense. He had observed the outline of a gun in the victim’s pants pocket. At one point during the argument the victim turned away and walked between two parked cars. However, the de
 
 *608
 
 fendant said the victim then turned around, threatened him, approached to within three or four feet of him, and made a jerking motion. That was when the defendant shot the victim.
 

 The defendant in
 
 Johnese
 
 was convicted of second degree murder, but on his motion for post-verdict judgment of acquittal the trial court modified the verdict to manslaughter. Both the State and the defendant appealed. The defendant did not raise any assignments of error. When referring to the trial court’s ruling the defendant maintained that he should have been acquitted, but that the record 12sSupported, at most, only a conviction of manslaughter. The appellate court considered and rejected the defendant’s self-defense claim he had asserted at trial.
 

 As for manslaughter, the appellate court in
 
 Johnese
 
 stated that the jury could have concluded that, despite evidence of provocation from the victim’s drunken, aggressive behavior, the defendant acted with deliberation and reflection, and not from heat of passion at the time of the shooting. The coui’t found that, viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not established by a preponderance of the evidence.
 

 Johnese
 
 is distinguishable from the instant case in that any rational trier of fact, viewing all of the evidence in a light most favorable to the prosecution, could have concluded that defendant demonstrated how much he had been provoked by the victim, or how hot he was, by the fact that he emptied his gun in/at defendant.
 

 In conclusion, viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant killed the victim in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.
 

 ASSIGNMENT OF ERROR NO. 3:
 

 In his third assignment of error, defendant argues that his conviction by a non-unanimous jury was unconstitutional.
 

 Louisiana Code of Criminal Procedure art. 782(A) states that cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. In the | ^instant case, the jury was polled after its verdict was read, and eleven jurors voted guilty of manslaughter, one juror voted not guilty.
 

 The Louisiana Supreme Court and this Court have rejected the argument that a non-unanimous verdict in a case such as the instant one, provided for by La.Code Crim. Proc. art. 782(A), violates the U.S. Fifth, Sixth or Fourteenth Amendments to the U.S. Constitution.
 
 State v. Bertrand,
 
 08-2215, 08-2311 (La.3/17/09), 6 So.3d 738;
 
 State v. Boudreaux,
 
 08-1504 (La.App. 4 Cir. 9/29/10), 48 So.3d 1144;
 
 State v. Barbour,
 
 09-1258 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142,
 
 writ denied,
 
 10-0934 (La.11/19/10), 49 So.3d 396,
 
 cert. denied., Barbour v. Louisiana,
 
 — U.S. -, 131 S.Ct. 1477, 179 L.Ed.2d 302 (2011).
 

 In
 
 Boudreaux,
 
 as in the instant case, defense counsel failed to object at trial to the jury instruction advising the jury that at least ten members of the jury must concur to reach a verdict. Neither did defense counsel move to declare La.Code Crim. Proc. art. 782(A) unconstitutional on any ground.
 

 In
 
 Bertrand,
 
 the trial court found that La.Code Crim. Proc. art. 782(A) violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, relative to the number of jurors needed to concur to render a verdict in cases in
 
 *609
 
 which punishment is necessarily confinement at hard labor. On direct appeal by the State, the Louisiana Supreme Court reversed, stating in its conclusion:
 

 Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
 

 Bertrand,
 
 08-2215, p. 8, 6 So.3d at 743.
 

 Thus, based on the jurisprudence, we find no merit to this assignment of error.
 

 Accordingly, for the reasons assigned above, we affirm the conviction and sentence.
 

 AFFIRMED